# MINNESOTA *v.* MURPHY

No. 82–827.   Argued October 12, 1983—Decided February 22, 1984

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. MAR-SHALL, J., filed a dissenting opinion, in which STEVENS, J., joined and in all but Part II–A of which BRENNAN, J., joined, *post*, p. 441.

*Robert H. Lynn* argued the cause for petitioner. With him on the brief was *Vernon E. Bergstrom.*

*David A. Strauss* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee, Assistant Attorney General Jensen,* and *Deputy Solicitor General Frey.*

*Mark S. Wernick* argued the cause and filed a brief for respondent.*

JUSTICE WHITE delivered the opinion of the Court.

In this case, respondent Murphy, who was on probation, made incriminating admissions during a meeting with his probation officer. The issue before us is whether the Fifth and Fourteenth Amendments prohibit the introduction into evidence of the admissions in Murphy's subsequent criminal prosecution.

## I

In 1974, Marshall Murphy was twice questioned by Minneapolis police concerning the rape and murder of a teenage girl. No charges were then brought. In 1980, in connection with a prosecution for criminal sexual conduct arising out of an unrelated incident, Murphy pleaded guilty to a reduced charge of false imprisonment. He was sentenced to a prison term of 16 months, which was suspended, and three years' probation. The terms of Murphy's probation required, among other things, that he participate in a treatment program for sexual offenders at Alpha House, report to his probation officer as directed, and be truthful with the probation officer "in all matters." Failure to comply with these conditions, Murphy was informed, could result in his return to the sentencing court for a probation revocation hearing. App. to Pet. for Cert. C–33—C–35.

Murphy met with his probation officer at her office approximately once a month, and his probation continued without incident until July 1981, when the officer learned that he had abandoned the treatment program. The probation offi-

---

*A brief of *amicus curiae* urging affirmance was filed by *Sheryl Joyce Lowenthal* for the National Association of Criminal Defense Lawyers.

A brief of *amici curiae* was filed by *Fred E. Inbau, Wayne W. Schmidt,* and *James P. Manak* for the International Association of Chiefs of Police, Inc., et al.

cer then wrote to Murphy and informed him that failure to set up a meeting would "result in an immediate request for a warrant." *Id.*, at C–35. At a meeting in late July, the officer agreed not to seek revocation of probation for nonparticipation in the treatment program since Murphy was employed and doing well in other areas.

In September 1981, an Alpha House counselor informed the probation officer that, during the course of treatment, Murphy had admitted to a rape and murder in 1974. After discussions with her superior, the officer determined that the police should have this information.[1] She then wrote to Murphy and asked him to contact her to discuss a treatment plan for the remainder of his probationary period.[2] Although she did not contact the police before the meeting, the probation officer knew in advance that she would report any incriminating statements.

Upon receipt of the letter, Murphy arranged to meet with his probation officer in her office on September 28, 1981. The officer opened the meeting by telling Murphy about the information she had received from the Alpha House counselor

---

[1] The parties stipulated in the trial court that Alpha House was covered by federal statutes providing for the confidentiality of patient records in federally assisted drug and alcohol rehabilitation programs, 21 U. S. C. § 1175 and 42 U. S. C. § 4582, and the regulations adopted pursuant thereto, 42 CFR pt. 2 (1982). Although the Alpha House counselor legitimately informed Murphy's probation officer of his incriminating admissions, we assume, without deciding, that the counselor could not have provided the information to the police. See *id.*, §§ 2.39(a), 2.63; Tr. of Oral Arg. 6. We assume, as well, that the probation officer could not have made the counselor's information available for use in a criminal prosecution. See 42 CFR § 2.39(d) (1982); Tr. of Oral Arg. 6–7.

[2] It is unclear whether the probation officer could have ordered Murphy to pursue additional treatment as a condition of probation. App. to Pet. for Cert. C–14 (testimony of Mara Widseth). But there is no evidence that she used treatment as a subterfuge or that her sole purpose was to obtain incriminating statements for the police. Under our view of the case, such a purpose would not change the result. *Infra*, at 428, 431.

and expressing her belief that this information evinced his continued need for treatment. Murphy became angry about what he considered to be a breach of his confidences and stated that he "felt like calling a lawyer."[3] The probation officer replied that Murphy would have to deal with that problem outside the office; for the moment, their primary concern was the relationship between the crimes that Murphy had admitted to the Alpha House counselor and the incident that led to his conviction for false imprisonment.

During the course of the meeting, Murphy denied the false imprisonment charge, admitted that he had committed the rape and murder, and attempted to persuade the probation officer that further treatment was unnecessary because several extenuating circumstances explained the prior crimes. At the conclusion of the meeting, the officer told Murphy that she had a duty to relay the information to the authorities and encouraged him to turn himself in. Murphy then left the office. Two days later, Murphy called his probation officer and told her that he had been advised by counsel not to surrender himself to the police. The officer then procured the issuance of an arrest and detention order from the judge who had sentenced Murphy on the false imprisonment charge.

---

[3] The trial court concluded that Murphy's statement did not constitute an invocation of the privilege against self-incrimination: "[W]hatever his real intent may have been, we are persuaded by the probation officer's testimony that he did not express [the] desire [to talk to an attorney] in any context other than a civil suit for the breach of confidentiality." App. to Pet. for Cert. B-13—B-14. The Minnesota Supreme Court did not reach this question, and, although we see no reason to question the trial court's factual finding, our analysis of the case makes further consideration unnecessary. Although a request for a lawyer during custodial interrogation is sufficient to invoke the privilege against self-incrimination, *Fare* v. *Michael C.*, 442 U. S. 707, 709 (1979), Murphy was not in custody, *infra*, at 433, and he had no federal right to have an attorney present at the meeting. See *United States* v. *Rea*, 678 F. 2d 382, 390 (CA2 1982); *People* v. *Ronald W.*, 31 App. Div. 2d 163, 165, 295 N. Y. S. 2d 767, 769 (1968), aff'd, 24 N. Y. 2d 732, 249 N. E. 2d 882 (1969); *Hughes* v. *Gwinn*, —— W. Va. ——, ——, 290 S. E. 2d 5, 7 (1981).

On October 29, 1981, a state grand jury returned an indictment charging Murphy with first-degree murder.

Murphy sought to suppress testimony concerning his confession on the ground that it was obtained in violation of the Fifth and Fourteenth Amendments. The trial court found that he was not "in custody" at the time of the statement and that the confession was neither compelled nor involuntary despite the absence of warnings similar to those required by *Miranda* v. *Arizona*, 384 U. S. 436 (1966). The Minnesota Supreme Court reversed on federal constitutional grounds. 324 N. W. 2d 340 (1982). Although recognizing that the Fifth Amendment privilege generally is not self-executing, it concluded that, notwithstanding the lack of custody in the usual sense, Murphy's failure to claim the privilege when he was questioned was not fatal to his claim "[b]ecause of the compulsory nature of the meeting, because [Murphy] was under court order to respond truthfully to his agent's questions, and because the agent had substantial reason to believe that [Murphy's] answers were likely to be incriminating." *Id.*, at 344. In the court's view, "the agent should have warned [Murphy] of his privilege against compelled self-incrimination before she questioned him and . . . her failure to do so, when she had already decided to report his answers to the police, bars use of [Murphy's] confession at this trial." *Ibid.*

We granted certiorari to resolve a conflict among state and federal courts concerning whether a statement made by a probationer to his probation officer without prior warnings is admissible in a subsequent criminal proceeding. 459 U. S. 1145 (1983).[4] We now reverse.

---

[4] Compare, *e. g.*, *United States* v. *Steele*, 419 F. Supp. 1385, 1386–1387 (WD Pa. 1976); *People* v. *Garcia*, 240 Cal. App. 2d 9, 12–13, 49 Cal. Rptr. 146, 148 (1966); and *State* v. *Lekas*, 201 Kan. 579, 582–584, 442 P. 2d 11, 15–16 (1968), with, *e. g.*, *United States* v. *Miller*, 643 F. 2d 713, 715 (CA10 1981); *United States* v. *Holmes*, 594 F. 2d 1167 (CA8), cert. denied, 444 U. S. 873 (1979); *Nettles* v. *State*, 248 So. 2d 259, 260 (Fla. App. 1971);

## II

The Fifth Amendment, in relevant part, provides that no person "shall be compelled in any criminal case to be a witness against himself." It has long been held that this prohibition not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also "privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz* v. *Turley*, 414 U. S. 70, 77 (1973). In all such proceedings,

> "a witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant. . . . Absent such protection, if he is nevertheless compelled to answer, his answers are inadmissible against him in a later criminal prosecution." *Id.*, at 78 (citations omitted).

A defendant does not lose this protection by reason of his conviction of a crime; notwithstanding that a defendant is imprisoned or on probation at the time he makes incriminating statements, if those statements are compelled they are inadmissible in a subsequent trial for a crime other than that for which he has been convicted. See *Baxter* v. *Palmigiano*, 425 U. S. 308, 316 (1976). The issue in this case is whether the Fifth Amendment right that Murphy enjoyed would be violated by the admission into evidence at his trial for another crime of the prior statements made by him to his probation officer.

---

*Connell* v. *State*, 131 Ga. App. 213, 205 S. E. 2d 513, 514 (1974); *State* v. *Hartman*, 281 N. W. 2d 639, 643–644 (Iowa App. 1979); and *People* v. *Parker*, 101 Misc. 2d 800, 802–804, 421 N. Y. S. 2d 561, 562–563 (1979).

## A

We note first that the general obligation to appear and answer questions truthfully did not in itself convert Murphy's otherwise voluntary statements into compelled ones. In that respect, Murphy was in no better position than the ordinary witness at a trial or before a grand jury who is subpoenaed, sworn to tell the truth, and obligated to answer on the pain of contempt, unless he invokes the privilege and shows that he faces a realistic threat of self-incrimination. The answers of such a witness to questions put to him are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over his valid claim of the privilege. This much is reasonably clear from our cases.

As this Court has long acknowledged:

> "The [Fifth] Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment." *United States* v. *Monia*, 317 U. S. 424, 427 (1943) (footnote omitted).

This principle has been applied in cases involving a variety of criminal and noncriminal investigations. See, *e. g., United States* v. *Kordel*, 397 U. S. 1, 7–10 (1970); *Rogers* v. *United States*, 340 U. S. 367, 370–371 (1951); *United States ex rel. Vajtauer* v. *Commissioner of Immigration*, 273 U. S. 103, 112–113 (1927). These cases, taken together, "stand for the proposition that, in the ordinary case, if a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself." *Garner* v. *United States*, 424 U. S. 648, 654 (1976) (footnote omitted). Witnesses who failed to claim the privilege were once said to have "waived" it, but we have recently abandoned this "vague term," *Green* v. *United States*,

355 U. S. 184, 191 (1957), and "made clear that an individual may lose the benefit of the privilege without making a knowing and intelligent waiver." *Garner* v. *United States, supra,* at 654, n. 9.

Although we have sometimes suggested in dicta that the usual rule might give way in situations where the government has "substantial reason to believe that the requested disclosures are likely to be incriminating," *Roberts* v. *United States,* 445 U. S. 552, 559 (1980), we have never adopted the view that a witness must "put the Government on notice by formally availing himself of the privilege" only when he alone "is reasonably aware of the incriminating tendency of the questions." *Id.,* at 562, n.* (BRENNAN, J., concurring). It has long been recognized that "[t]he Constitution does not forbid the asking of criminative questions," *United States* v. *Monia, supra,* at 433 (Frankfurter, J., dissenting), and nothing in our prior cases suggests that the incriminating nature of a question, by itself, excuses a timely assertion of the privilege. See, *e. g., United States* v. *Mandujano,* 425 U. S. 564, 574–575 (1976) (plurality opinion). If a witness—even one under a general compulsion to testify—answers a question that both he and the government should reasonably expect to incriminate him, the Court need ask only whether the particular disclosure was "compelled" within the meaning of the Fifth Amendment.

*United States* v. *Kordel, supra,* perhaps the first case squarely to hold that a witness under compulsion to make disclosures must assert the privilege in a timely manner, is illustrative. In answering interrogatories submitted by the Government in a civil case against a corporation, a corporate officer who had been notified of contemplated criminal action against him supplied evidence and leads helpful in securing his indictment and conviction. Although the relationship between the civil and criminal actions was clear and "[w]ithout question [the officer] could have invoked his Fifth Amendment privilege," *id.,* at 7, he did not do so. The Court concluded without hesitation that "[h]is failure at any time to

assert the constitutional privilege leaves him in no position to complain now that he was compelled to give testimony against himself." *Id.*, at 10 (footnote omitted).

## B

Thus it is that a witness confronted with questions that the government should reasonably expect to elicit incriminating evidence ordinarily must assert the privilege rather than answer if he desires not to incriminate himself. If he asserts the privilege, he "may not be required to answer a question if there is some rational basis for believing that it will incriminate him, at least without *at that time* being assured that neither it nor its fruits may be used against him" in a subsequent criminal proceeding. *Maness* v. *Meyers,* 419 U. S. 449, 473 (1975) (WHITE, J., concurring in result) (emphasis in original). But if he chooses to answer, his choice is considered to be voluntary since he was free to claim the privilege and would suffer no penalty as the result of his decision to do so. As the Minnesota Supreme Court recognized, application of this general rule is inappropriate in certain well-defined situations. In each of those situations, however, some identifiable factor "was held to deny the individual a 'free choice to admit, to deny, or to refuse to answer.'" *Garner* v. *United States, supra,* at 657 (quoting *Lisenba* v. *California,* 314 U. S. 219, 241 (1941)). Because we conclude that no such factor was present here, we hold that the Minnesota Supreme Court erred in excluding the probation officer's testimony.

## 1

A well-known exception to the general rule addresses the problem of confessions obtained from suspects in police custody.[5] Not only is custodial interrogation ordinarily con-

---

[5] We emphasize that Murphy was not under arrest and that he was free to leave at the end of the meeting. A different question would be presented if he had been interviewed by his probation officer while being held in police custody or by the police themselves in a custodial setting.

ducted by officers who are "acutely aware of the potentially incriminatory nature of the disclosures sought," *Garner* v. *United States*, 424 U. S., at 657, but also the custodial setting is thought to contain "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda* v. *Arizona*, 384 U. S., at 467. See *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 246–247 (1973). To dissipate "the overbearing compulsion . . . caused by isolation of a suspect in police custody," *United States* v. *Washington*, 431 U. S. 181, 187, n. 5 (1977), the *Miranda* Court required the exclusion of incriminating statements obtained during custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it. 384 U. S., at 467–469, 475–477. We have consistently held, however, that this extraordinary safeguard "does not apply outside the context of the inherently coercive custodial interrogations for which it was designed." *Roberts* v. *United States, supra,* at 560.

The Minnesota Supreme Court recognized that Murphy was not "in custody" when he made his incriminating admissions. He was, to be sure, subject to a number of restrictive conditions governing various aspects of his life, and he would be regarded as "in custody" for purposes of federal habeas corpus. See *Jones* v. *Cunningham*, 371 U. S. 236, 241–243 (1963). But custody in that context has been defined broadly to effectuate the purposes of the writ, *id.,* at 243; *Hensley* v. *Municipal Court*, 411 U. S. 345, 349–351 (1973), and custody for *Miranda* purposes has been more narrowly circumscribed. See *Oregon* v. *Mathiason*, 429 U. S. 492 (1977) *(per curiam).* Under the narrower standard appropriate in the *Miranda* context, it is clear that Murphy was not "in custody" for purposes of receiving *Miranda* protection since there was no " 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Cali-*

*fornia* v. *Beheler*, 463 U. S. 1121, 1125 (1983) *(per curiam)* (quoting *Oregon* v. *Mathiason, supra,* at 495).

Notwithstanding the inapplicability of *Miranda,* the Minnesota Supreme Court held that the probation officer's failure to inform Murphy of the Fifth Amendment privilege barred use of his confession at trial. Four factors have been advanced in support of this conclusion, but we find them, alone or in combination, insufficient to excuse Murphy's failure to claim the privilege in a timely manner.

First, the probation officer could compel Murphy's attendance and truthful answers. The Minnesota Supreme Court failed to explain how this transformed a routine interview into an inherently coercive setting. In our view, this factor subjected Murphy to less intimidating pressure than is imposed on grand jury witnesses, who are sworn to tell the truth and placed in a setting conducive to truthtelling. Although warnings in both contexts might serve to dissipate "any possible coercion or unfairness resulting from a witness' misimpression that he must answer truthfully even questions with incriminat[ing] aspects," *United States* v. *Washington,* 431 U. S., at 188, we have never held that they must be given to grand jury witnesses, *id.,* at 186, and we decline to require them here since the totality of the circumstances is not such as to overbear a probationer's free will. See *Rogers* v. *Richmond,* 365 U. S. 534, 544 (1961).

Second, the probation officer consciously sought incriminating evidence. We have already explained that this factor does not give rise to a self-executing privilege, *supra,* at 428, and we pause here only to emphasize that police officers questioning persons suspected of crimes often consciously seek incriminating statements. The mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings, *Beckwith* v. *United States,* 425 U. S. 341 (1976), and the probation officer's knowledge and intent have no bearing on the outcome of this case.

Third, Murphy did not expect questions about prior criminal conduct and could not seek counsel before attending the meeting. But the nature of probation is such that probationers should expect to be questioned on a wide range of topics relating to their past criminality. Moreover, the probation officer's letter, which suggested a need to discuss treatment from which Murphy had already been excused, would have led a reasonable probationer to conclude that new information had come to her attention. In any event, Murphy's situation was in this regard indistinguishable from that facing suspects who are questioned in noncustodial settings and grand jury witnesses who are unaware of the scope of an investigation or that they are considered potential defendants. See *United States* v. *Washington, supra,* at 188–189; *Beckwith* v. *United States, supra,* at 346–348.

Fourth, there were no observers to guard against abuse or trickery. Again, this often will be true when a suspect is subjected to noncustodial interrogation, where no warnings are required. Murphy does not allege that the probation officer was not legitimately concerned with the need for further treatment, and we cannot conclude that her actions would have led a reasonable probationer to believe that his statements to her would remain confidential. A probationer cannot pretend ignorance of the fact that his probation officer "is a peace officer, and as such is allied, to a greater or lesser extent, with his fellow peace officers." *Fare* v. *Michael C.,* 442 U. S. 707, 720 (1979). See *Cabell* v. *Chavez-Salido,* 454 U. S. 432, 447 (1982). Absent some express or implied promise to the contrary, he may also be charged with knowledge that "the probation officer is duty bound to report wrongdoing by the [probationer] when it comes to his attention, even if by communication from the [probationer] himself." *Fare* v. *Michael C., supra,* at 720. The fact that Murphy apparently expressed no surprise on being informed that his statements would be made available to the police, moreover, strongly suggests that he was not misled by any expectation that his statements would remain confidential.

See App. to Pet. for Cert. C–21 (testimony of Mara Widseth); *id.*, at C–28 (testimony of Marshall Murphy).

Even a cursory comparison of custodial interrogation and probation interviews reveals the inaptness of the Minnesota Supreme Court's analogy to *Miranda.* Custodial arrest is said to convey to the suspect a message that he has no choice but to submit to the officers' will and to confess. *Miranda* v. *Arizona*, 384 U. S., at 456–457. It is unlikely that a probation interview, arranged by appointment at a mutually convenient time, would give rise to a similar impression. Moreover, custodial arrest thrusts an individual into "an unfamiliar atmosphere" or "an interrogation environment . . . created for no purpose other than to subjugate the individual to the will of his examiner." *Id.*, at 457. Many of the psychological ploys discussed in *Miranda* capitalize on the suspect's unfamiliarity with the officers and the environment. Murphy's regular meetings with his probation officer should have served to familiarize him with her and her office and to insulate him from psychological intimidation that might overbear his desire to claim the privilege. Finally, the coercion inherent in custodial interrogation derives in large measure from an interrogator's insinuations that the interrogation will continue until a confession is obtained. *Id.*, at 468. Since Murphy was not physically restrained and could have left the office, any compulsion he might have felt from the possibility that terminating the meeting would have led to revocation of probation was not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator.[6]

---

[6] Neither the trial court nor the Minnesota Supreme Court found that Murphy believed that his probation could have been revoked for leaving the meeting or that he remained in the office for this reason. Since the meeting was scheduled at a mutually convenient time and was arranged pursuant to a request that did not include any threat, it is unlikely that Murphy believed that terminating the meeting would have jeopardized his probationary status.

We conclude, therefore, that Murphy cannot claim the benefit of the first exception to the general rule that the Fifth Amendment privilege is not self-executing.

2

The general rule that the privilege must be claimed when self-incrimination is threatened has also been deemed inapplicable in cases where the assertion of the privilege is penalized so as to "foreclos[e] a free choice to remain silent, and . . . compe[l] . . . incriminating testimony." *Garner* v. *United States,* 424 U. S., at 661. Because revocation of his probation was threatened if he was untruthful with his probation officer, Murphy argues that he was compelled to make incriminating disclosures instead of claiming the privilege. Although this contention is not without force, we find it unpersuasive on close examination.

In each of the so-called "penalty" cases, the State not only compelled an individual to appear and testify, but also sought to induce him to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions "capable of forcing the self-incrimination which the Amendment forbids." *Lefkowitz* v. *Cunningham,* 431 U. S. 801, 806 (1977). In most of the cases, the attempt to override the witnesses' privilege proved unsuccessful, and the Court ruled that the State could not constitutionally make good on its prior threat. *Lefkowitz* v. *Turley,* 414 U. S., at 79–84; *Sanitation Men* v. *Commissioner of Sanitation,* 392 U. S. 280, 283–284 (1968); *Gardner* v. *Broderick,* 392 U. S. 273, 278–279 (1968). These cases make clear that "a State may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself." *Lefkowitz* v. *Cunningham, supra,* at 805. Occasionally, however, an individual succumbed to the pressure placed upon him, failed to assert the privilege, and disclosed incriminating information, which the State later sought to use against him in a criminal prosecution. *Garrity* v. *New Jersey,* 385 U. S. 493 (1967), was such a case, and the Court

held that an individual threatened with discharge from employment for exercising the privilege had not waived it by responding to questions rather than standing on his right to remain silent. *Id.*, at 498–499.

The threat of punishment for reliance on the privilege distinguishes cases of this sort from the ordinary case in which a witness is merely required to appear and give testimony. A State may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege. The result may be different if the questions put to the probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution. There is thus a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.[7]

---

[7] The situation would be different if the questions put to a probationer were relevant to his probationary status and posed no realistic threat of incrimination in a separate criminal proceeding. If, for example, a residential restriction were imposed as a condition of probation, it would appear unlikely that a violation of that condition would be a criminal act. Hence, a claim of the Fifth Amendment privilege in response to questions relating to a residential condition could not validly rest on the ground that the answer might be used to incriminate if the probationer was tried for another crime. Neither, in our view, would the privilege be available on the ground that answering such questions might reveal a violation of the residential requirement and result in the termination of probation. Although a revocation proceeding must comport with the requirements of due process, it is not a criminal proceeding. *Gagnon* v. *Scarpelli*, 411 U. S. 778, 782 (1973); *United States* v. *Johnson*, 455 F. 2d 932, 933 (CA5), cert. denied, 409 U. S. 856 (1972). Just as there is no right to a jury trial before probation may be revoked, neither is the privilege against compelled self-incrimination available to a probationer. It follows that whether or not the answer to a question about a residential requirement is

Even so we must inquire whether Murphy's probation conditions merely required him to appear and give testimony about matters relevant to his probationary status or whether they went further and required him to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent. Because we conclude that Minnesota did not attempt to take the extra, impermissible step, we hold that Murphy's Fifth Amendment privilege was not self-executing.

As we have already indicated, Murphy was informed that he was required to be truthful with his probation officer in all matters and that failure to do so could result in revocation of probation. The opinion of the Minnesota Supreme Court made clear that this was indeed the case, but its conclusion that the probation officer's failure to give Murphy adequate warnings barred the use of his incriminating statements in the criminal trial did not rest on the ground that a refusal to furnish incriminating information would have justified revocation of probation. Although the court recognized that imposing a penalty for a valid exercise of the Fifth Amendment

compelled by the threat of revocation, there can be no valid claim of the privilege on the ground that the information sought can be used in revocation proceedings.

Our cases indicate, moreover, that a State may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination. Under such circumstances, a probationer's "right to immunity as a result of his compelled testimony would not be at stake," *Sanitation Men* v. *Commissioner of Sanitation*, 392 U. S. 280, 284 (1968); see *Lefkowitz* v. *Cunningham*, 431 U. S. 801, 805–806 (1977); *Lefkowitz* v. *Turley*, 414 U. S. 70, 84–85 (1973); *Gardner* v. *Broderick*, 392 U. S. 273, 278 (1968), and nothing in the Federal Constitution would prevent a State from revoking probation for a refusal to answer that violated an express condition of probation or from using the probationer's silence as "one of a number of factors to be considered by the finder of fact" in deciding whether other conditions of probation have been violated. *Lefkowitz* v. *Cunningham, supra*, at 808, n. 5. See *Baxter* v. *Palmigiano*, 425 U. S. 308, 317–318 (1976).

privilege could impermissibly foreclose a free choice to remain silent, 324 N. W. 2d, at 342–343, it did not purport to find that Minnesota's probation revocation statute had such an effect. The court relied instead on the fact that Murphy was under legal compulsion to attend the meeting and to answer truthfully the questions of a probation officer who anticipated incriminating answers. *Id.*, at 344. Such compulsion, however, is indistinguishable from that felt by any witness who is required to appear and give testimony, and, as we have already made clear, it is insufficient to excuse Murphy's failure to exercise the privilege in a timely manner.

The state court did not attempt to define the precise contours of Murphy's obligation to respond to questions. On its face, Murphy's probation condition proscribed only false statements; it said nothing about his freedom to decline to answer particular questions and certainly contained no suggestion that his probation was conditional on his waiving his Fifth Amendment privilege with respect to further criminal prosecution. "At this point in our history virtually every schoolboy is familiar with the concept, if not the language, of the [Fifth Amendment]." *Michigan* v. *Tucker*, 417 U. S. 433, 439 (1974). Yet Murphy, although he had a right to do so, see *State* v. *Austin*, 295 N. W. 2d 246 (Minn. 1980), did not seek clarification of the condition. Without the benefit of an authoritative state-court construction of the condition, we are hesitant to read into the truthfulness requirement an additional obligation that Murphy refrain from raising legitimate objections to furnishing information that might lead to his conviction for another crime.

Whether we employ a subjective or an objective test, there is no reasonable basis for concluding that Minnesota attempted to attach an impermissible penalty to the exercise of the privilege against self-incrimination. There is no direct evidence that Murphy confessed because he feared that his probation would be revoked if he remained silent. Unlike the police officers in *Garrity* v. *New Jersey*, 385 U. S. 493

(1967), Murphy was not expressly informed during the crucial meeting with his probation officer that an assertion of the privilege would result in the imposition of a penalty. And the fact that Murphy apparently felt no compunction about adamantly denying the false imprisonment charge on which he had been convicted before admitting to the rape and murder strongly suggests that the "threat" of revocation did not overwhelm his resistance.

If Murphy did harbor a belief that his probation might be revoked for exercising the Fifth Amendment privilege, that belief would not have been reasonable. Our decisions have made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege. It is not surprising, then, that neither the state court nor any state officer has suggested otherwise. Indeed, in its brief in this Court, the State submits that it would not, and legally could not, revoke probation for refusing to answer questions calling for information that would incriminate in separate criminal proceedings. Brief for Petitioner 36–39, and n. 7. See also Tr. of Oral Arg. 7–8, 10–14.

Minnesota's revocation statute, which was accurately summarized in Murphy's notice of probation, see App. to Pet. for Cert. C–33—C–34, authorizes revocation "[w]hen it appears that the defendant has violated any of the conditions of his probation or has otherwise been guilty of misconduct which warrants the imposing or execution of sentence." Minn. Stat. § 609.14 (1982). Revocation is not automatic under this provision. Even if the probation officer desires revocation, a probationer must be afforded a hearing, *Pearson* v. *State*, 308 Minn. 287, 289–290, 241 N. W. 2d 490, 492–493 (1976); *State ex rel. Halverson* v. *Young*, 278 Minn. 381, 386–387, 154 N. W. 2d 699, 702–703 (1967), and the court must find that he violated a specific condition, that the violation was intentional or inexcusable, and that the need for confinement outweighs the policies favoring probation. *State* v. *Austin*,

*supra,* at 250.   We have not been advised of any case in which Minnesota has attempted to revoke probation merely because a probationer refused to make nonimmunized disclosures concerning his own criminal conduct; and, in light of our decisions proscribing threats of penalties for the exercise of Fifth Amendment rights, Murphy could not reasonably have feared that the assertion of the privilege would have led to revocation.

Accordingly, we cannot conclude that Murphy was deterred from claiming the privilege by a reasonably perceived threat of revocation.

### 3

A third exception to the general requirement of a timely assertion of the Fifth Amendment privilege, closely related to the penalty exception, has been developed in the context of the federal occupational and excise taxes on gamblers.   In recognition of the pervasive criminal regulation of gambling activities and the fact that claiming the privilege in lieu of filing a return would tend to incriminate, the Court has held that the privilege may be exercised by failing to file. *Marchetti* v. *United States,* 390 U. S. 39 (1968); *Grosso* v. *United States,* 390 U. S. 62 (1968).   See also *Mackey* v. *United States,* 401 U. S. 667 (1971).

> "[M]aking a claim of privilege when the disclosures were requested, *i. e.,* when the returns were due, would have identified the claimant as a gambler.   The Court therefore forgave the usual requirement that the claim of privilege be presented for evaluation in favor of a 'claim' by silence. . . . If a particular gambler would not have incriminated himself by filing the tax returns, the privilege would not justify a failure to file." *Garner* v. *United States,* 424 U. S., at 658–659, n. 11.

But, while a taxpayer who claims the privilege instead of filing gambling tax returns necessarily identifies himself as a gambler, a probationer confronted with incriminating ques-

tions ordinarily will have no problem effectively claiming the privilege at the time disclosures are requested. There exists, therefore, no reason to forgive the requirement that the claim be presented for evaluation in a timely manner.[8]

## III

We conclude, in summary, that since Murphy revealed incriminating information instead of timely asserting his Fifth Amendment privilege, his disclosures were not compelled incriminations. Because he had not been compelled to incriminate himself, Murphy could not successfully invoke the privilege to prevent the information he volunteered to his probation officer from being used against him in a criminal prosecution.

The judgment of the Minnesota Supreme Court is

*Reversed.*

---

[8] Nothing in *Mackey* v. *United States*, 401 U. S. 667 (1971), requires a different conclusion. In that case, which arose before the Court recognized a privilege not to file gambling tax returns, the taxpayer filed a return that was introduced as evidence in a criminal prosecution for income tax evasion. A majority of the Court considered the disclosures to have been compelled incriminations, *id.*, at 672 (plurality opinion); *id.*, at 704–705 (BRENNAN, J., concurring in judgment); *id.*, at 713 (Douglas, J., dissenting), but the taxpayer was not immunized against their use because *Marchetti* and *Grosso* were not given retroactive effect. 401 U. S., at 674–675 (plurality opinion); *id.*, at 700–701 (Harlan, J., concurring in judgment). Even assuming that the taxpayer's disclosures would have been excluded if we had applied *Marchetti* and *Grosso* retroactively, "[i]t does not follow necessarily that a taxpayer would be immunized against use of disclosures made on gambling tax returns when the Fifth Amendment would have justified a failure to file at all." *Garner* v. *United States*, 424 U. S. 648, 659, n. 13 (1976). In other words, a taxpayer making incriminating disclosures on a return filed after *Marchetti* and *Grosso* could not necessarily prevent the use of those disclosures in a criminal prosecution because he had been afforded an effective way to assert the privilege. Murphy's situation, we believe, is analogous to that of the post-*Marchetti* taxpayer: Since he could have asserted the privilege effectively but failed to do so, his disclosures cannot be viewed as compelled incriminations.

JUSTICE MARSHALL, with whom JUSTICE STEVENS joins, and with whom JUSTICE BRENNAN joins except as to Part II–A, dissenting.

The opinion of the Court helpfully clarifies the scope of the privilege against self-incrimination that may be asserted by a probationer when asked questions by an officer of the State. As the majority points out, two principles shape the probationer's constitutional rights. First, because probation revocation proceedings are not criminal in nature, *Gagnon* v. *Scarpelli*, 411 U. S. 778, 782 (1973), and because the Fifth Amendment ban on compelled self-incrimination applies only to criminal proceedings, the possibility that a truthful answer to a question might result in the revocation of his probation does not accord the probationer a constitutional right to refuse to respond. *Ante*, at 435–436, n. 7. Second, a probationer retains the privilege enjoyed by all citizens to refuse "to answer official questions put to him in any . . . proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings," *Lefkowitz* v. *Turley*, 414 U. S. 70, 77 (1973). *Ante*, at 426.

From the foregoing propositions, it follows that the power of a State to compel a probationer to answer a given question varies depending upon the manner in which the probationer's answer might incriminate him. If a truthful response might reveal that he has violated a condition of his probation but would not subject him to criminal prosecution, the State may insist that he respond and may penalize him for refusing to do so.[1] See *ante*, at 435–436, n. 7. By contrast, if there is a chance that a truthful answer to a given question would expose the probationer to liability for a crime different from the crime for which he has already been convicted, he has a right to refuse to answer and the State may not attempt to coerce

---

[1] This is not to suggest that a State must or should organize its probation system in a fashion that compels probationers to respond under these circumstances, only that a State is not prevented by the Federal Constitution from doing so.

442

him to forgo that right.[2]  See *ante*, at 435.  As the majority points out, if the answer to a question might lead both to criminal sanctions and to probation revocation, the State has the option of insisting that the probationer respond, in return for an express guarantee of immunity from criminal liability.[3] *Ante*, at 436, n. 7.  Unless it exercises that option, however, the State may not interfere with the probationer's right "to remain silent unless he chooses to speak in the unfettered exercise of his own will," *Malloy* v. *Hogan*, 378 U. S. 1, 8 (1964).

The flaw in the opinion of the Court lies not in its analysis of the constitutional rights available to a probationer, but in its finding that those rights were not violated in this case. The majority concludes that, "since Murphy revealed incriminating information instead of timely asserting his Fifth Amendment privilege, his disclosures were not compelled incriminations." *Ante*, at 440.  In my view, that conclusion is inconsistent with our prior cases dealing with invocations of the Fifth Amendment.  For two independent reasons, Murphy's failure to claim his privilege against self-incrimination before responding to his probation officer's inquiry regarding his participation in the 1974 murder did not result in the forfeiture of his right to object to the use of his admissions in a subsequent criminal prosecution.  First, the State of Minne-

---

[2] It makes no difference whether the criminal conduct that the probationer might reveal was committed before or after the crime for which he was convicted or before or after the conviction itself.

[3] JUSTICE BRENNAN and I remain persuaded that "the Fifth Amendment's privilege against self-incrimination requires that any jurisdiction that compels a man to incriminate himself grant him absolute immunity under its laws from prosecution for any transaction revealed in that testimony." *Piccirillo* v. *New York*, 400 U. S. 548, 562 (1971) (BRENNAN, J., joined by MARSHALL, J., dissenting).  A majority of the Court, however, adheres to the view that the constitutional prohibition is not violated as long as the witness is accorded immunity against the use, in a criminal prosecution, of his testimony or the fruits thereof.  See, *e. g.*, *Lefkowitz* v. *Turley*, 414 U. S. 70, 84 (1973).

sota had threatened Murphy with a penalty for refusing to respond to questions; our decisions make clear that such a threat relieves its target of the duty to claim the benefit of the Fifth Amendment. Second, under the circumstances of this case, the State was obliged to prove that Murphy was aware of his constitutional rights and freely waived them; by showing nothing more than that Murphy failed to assert his privilege before answering, the State failed to carry its burden.

## I

As the majority acknowledges, if an officer of a State asks a person a question under circumstances that deprive him of a "'free choice to admit, to deny, or to refuse to answer,'" and he answers the question without attempting to assert his privilege against self-incrimination, his response will be deemed to have been "compelled" and will be inadmissible as evidence against him. *Garner* v. *United States*, 424 U. S. 648, 656–657 (1976) (quoting *Lisenba* v. *California*, 314 U. S. 219, 241 (1941)); see *ante*, at 429. Our cases make clear that the State will be found to have deprived the person of such a "free choice" if it threatens him with a substantial sanction if he refuses to respond. *Lefkowitz* v. *Turley*, 414 U. S., at 82–83. Two rules flow from the foregoing principle: If the State presents a person with the "Hobson's choice" of incriminating himself or suffering a penalty, and he nevertheless refuses to respond, the State cannot constitutionally make good on its threat to penalize him. *Id.*, at 77; *Sanitation Men* v. *Commissioner of Sanitation*, 392 U. S. 280, 284 (1968); *Gardner* v. *Broderick*, 392 U. S. 273, 277–278 (1968). Conversely, if the threatened person decides to talk instead of asserting his privilege, the State cannot use his admissions against him in a subsequent criminal prosecution. *Garrity* v. *New Jersey*, 385 U. S. 493, 500 (1967).

It might appear that these two rules would defeat one another. A person presented with what appears to be a Hobson's choice could be charged with the knowledge that,

under this Court's precedents, he may choose either option with impunity. His awareness that the State can use neither his silence nor his confessions against him would seem to eliminate the "compulsion" supposedly inherent in the situation.[4] More specifically, it might be argued that, because it is now settled that a person cannot be penalized for asserting his Fifth Amendment privilege, if he decides to talk rather than assert his constitutional right to remain silent, his statements should be deemed voluntary.

This Court has consistently refused to allow the two rules to undercut each other in this way.[5] Our refusal derives from two considerations. First, many—probably most—of the persons threatened with sanctions if they refuse to answer official questions lack sufficient knowledge of this Court's decisions to be aware that the State's threat is idle. Second, the State's *attempt* to coerce self-incriminating statements by promising to penalize silence is itself constitutionally offensive, and the mere possibility that the State profited from the attempt is sufficient to forbid it to make use of the admissions it elicited. See *Gardner* v. *Broderick, supra,* at 279.

For similar reasons, when a person who has been threatened with a penalty makes self-incriminating statements, we

---

[4] See Friendly, The Fifth Amendment Tomorrow: The Case for Constitutional Change, 37 U. Cin. L. Rev. 671, 708 (1968); *Spevak* v. *Klein,* 385 U. S. 511, 531 (1967) (WHITE, J., dissenting).

[5] Thus, in *Lefkowitz* v. *Turley, supra,* the Court described its prior decision in *Gardner* v. *Broderick,* 392 U. S. 273 (1968), in the following terms: "Although under *Garrity* any waiver executed may have been invalid and any answers elicited inadmissible in evidence, the State did not purport to recognize as much and instead attempted to coerce a waiver on the penalty of loss of employment. . . . Hence, the State's statutory provision requiring [appellant's] dismissal for his refusal to waive immunity could not stand." 414 U. S., at 80–81. In the same opinion, the Court acknowledged that the rule announced in *Garrity* itself remained good law. See 414 U. S., at 79–80, 82. The Court today does not question the vitality of either the line of cases originating in *Gardner* or the line originating in *Garrity.*

have declined to inquire whether his decision to speak was the proximate result of the threat. In most cases, it would be difficult for the person to prove that, but for the threat, he would have held his peace and that no other intervening causes (such as pangs of conscience) induced him to confess.[6] The State, having exerted pressures repugnant to the Constitution, should not be allowed to profit from the uncertainty whether those pressures had their intended effect. Sensitivity to the foregoing concerns is reflected in our decision in *Garrity* v. *New Jersey, supra.* The petitioners in that case had never argued that their confessions were in fact induced by the State's warning that they might be fired if they refused to answer, and the lower courts had not so found.[7] Nevertheless, the Court concluded that the petitioners' statements "were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary." *Id.*, at 497–498 (footnote omitted).

In sum, the majority errs when it suggests that, to claim the benefit of the Fifth Amendment, a person who made self-incriminating statements after being threatened with a penalty if he remained silent must show that his apprehension that the State would carry out its promise was objectively "reasonable," *ante*, at 438. Our decisions make clear that the

---

[6] Such proof would be especially difficult in cases in which the defendant has confessed to a serious crime, thereby subjecting himself to a penalty— in the form of protracted incarceration—far more severe than the penalty that the State threatened to impose if he refused to answer. Despite the implausibility, under such circumstances, of an allegation that the State's threat induced the confession, we have never suggested that the defendant would be unable to avail himself of the doctrine enunciated in *Garrity*. Indeed, the situation presented in *Garrity* itself fits the scenario just described.

[7] As Justice Harlan observed in dissent: "All of the petitioners consented to give statements, none displayed any significant hesitation, and none suggested that the decision to offer information was motivated by the possibility of discharge." 385 U. S., at 505. The majority did not question Justice Harlan's description of the case.

threat alone is sufficient to render all subsequent testimony "compelled." See *supra*, at 443–444.[8]  Likewise, the majority errs when it implies that a defendant has a duty to prove that the State's threat, and not some other motivation, prompted his confession, see *ante*, at 437–438.  Under our precedents, the defendant need only prove that the State presented him with a constitutionally impermissible choice and that he thereupon incriminated himself.  See *supra*, at 444–445.

When the foregoing principles are applied to this case, it becomes clear that Murphy's confession to the 1974 murder must be deemed to have been "compelled."  When Murphy was placed on probation, he was given a letter setting forth the conditions under which he was discharged.  The pertinent portions of the letter provide:

> "For the present you are only conditionally released.  If you comply with the conditions of your probation you may expect to be discharged at the expiration of the period stated.  If you fail to comply with the requirements you may be returned to Court at any time for further hearing or commitment. . . .
>
> "It will be necessary for you to obey strictly the following conditions:
>
> "BE TRUTHFUL to your Probation Officer in all matters."  App. to Pet. for Cert. C–33—C–34 (emphasis in original).

Murphy was required to sign the letter, attesting that he had read and understood the instructions.  *Id.*, at C–35.

---

[8] Cf. *Escobedo* v. *Illinois*, 378 U. S. 478, 499 (1964) (WHITE, J., dissenting) ("If an accused is told he must answer and does not know better, it would be very doubtful that the resulting admissions could be used against him").

A similar principle obtains in the Fourth Amendment context.  It is well established that a "consent" to a search that consists of nothing more than submission to the "presumed authority" of a colorably valid search warrant is invalid.  *E. g.*, *Lo-Ji Sales, Inc.* v. *New York*, 442 U. S. 319, 329 (1979); *Bumper* v. *North Carolina*, 391 U. S. 543, 548–549 (1968).

The majority contends that the foregoing passages merely required Murphy to answer nonincriminating questions and forbade him to make false statements to his probation officer. *Ante*, at 437. The majority's interpretation, which is essential to its result, is simply incredible. A reasonable layman would interpret the imperative, "be truthful . . . in all matters," as a command to answer honestly all questions presented. Any ambiguity inherent in the language of the directive is dispelled by its context. The duty to be truthful in dealings with the probation officer is listed as the first term of the conditions of probation. The critical phrase is capitalized. And the injunction is immediately preceded by an instruction "to obey strictly the following conditions." [9]

In short, the State of Minnesota presented Murphy with a set of official instructions that a reasonable man would have interpreted to require him, upon pain of the revocation of his probation, to answer truthfully all questions asked by his probation officer. [10] Probation revocation surely constitutes a

---

[9] The Solicitor General observes: "Citizens are often required to be truthful in their dealings with the government; any person commits a crime if, for example, he makes a false statement to a federal law enforcement officer in connection with a matter within the officer's jurisdiction. 18 U. S. C. 1001." Brief for United States as *Amicus Curiae* 19. It is precisely because such proscriptions on lying to government officials are so common that the emphatic injunction contained in Murphy's probation conditions must be interpreted to impose on him more extensive obligations.

[10] At the time Murphy made his confession, no Minnesota court had authoritatively interpreted either the probation condition at issue or the Minnesota statute from which it derives. Nor can a definitive construction of these crucial aspects of state law be found in the opinions of either the trial court or the Minnesota Supreme Court in this case. After cataloging the considerations on which it founded its ruling that Murphy's confession was admissible, the trial court observed: "Against these factors is the fact that a condition of his probation was that he be honest with his probation officer, and that he was there ostensibly to discuss further treatment in regard to his current probation. Failure to follow through with either of these could have resulted in revocation of the probation and potential imprisonment." App. to Pet. for Cert. B–14. The foregoing

"substantial sanction."[11]   Under our precedents, therefore, by threatening Murphy with that sanction if he refused to answer, Minnesota deprived itself of constitutional authority to use Murphy's subsequent answers in a criminal prosecution against him.

The majority's efforts to avoid that conclusion are unpersuasive.   First, the majority faults Murphy for failing to ask his probation officer for a "clarification" of the terms of his probation.   *Ante*, at 437.   The letter by which the State informed Murphy of the terms of his probation contained no suggestion that he was entitled to such a "clarification"; on the contrary, the letter informed Murphy that he was required to "obey strictly" the conditions enumerated and that failure to do so might result in his "commitment."   More importantly, as indicated above, our decisions establish that a

passage suggests that the trial court assumed that Murphy was under a duty to answer all questions presented by his probation officer, but is too ambiguous to be fairly relied upon as an "interpretation" of the probation condition.   Because the State Supreme Court held Murphy's confession inadmissible for different reasons, it did not have occasion to decide whether a refusal to answer the questions asked by his probation officer would have exposed Murphy to revocation of his probation.   The majority professes to be "hesitant," "[w]ithout the benefit of an authoritative state-court construction of the condition," to construe it to impose upon Murphy a duty to answer in addition to a duty not to lie.   *Ante*, at 437.   For the reasons indicated in the text, I do not share the majority's hesitation; it seems to me clear that a reasonable man would have interpreted the letter to require him to answer all questions.   But even if I agreed that the import of the crucial phrase is not apparent, I would object to the majority's disposition of the case.   The proper course would be to remand to the Minnesota Supreme Court to allow it to provide an "authoritative construction" of the provisions of state law around which the dispute revolves.

[11] Even the critics of the line of cases forbidding use of statements made after a State threatened a witness with an economic sanction acknowledge that a State may not threaten to put a person in jail for refusing to answer questions.   See Friendly, 37 U. Cin. L. Rev., at 676; Greenawalt, Silence as a Moral and Constitutional Right, 23 Wm. & Mary L. Rev. 15, 66–68 (1981).

person told by the State that he may be penalized for refusing to answer does not bear the responsibility to determine whether the State would or could make good on its threat. See *supra*, at 443–444. Second, the majority relies on the absence of "direct evidence that Murphy confessed because he feared that his probation would be revoked if he remained silent." *Ante*, at 437. Under our precedents, no such "direct evidence" of a causal link between the threat and the response is required in order to prevent the use in a criminal prosecution of Murphy's confession. See *supra*, at 444–445.

In conclusion, because the terms of Murphy's probation deprived him of "a free choice to admit, to deny, or to refuse to answer" when his probation officer confronted him with the allegation that he had committed the 1974 murder, our decisions forbid the introduction into evidence against him of his confession.

## II

Even if Minnesota had not impaired Murphy's freedom to respond or to refuse to respond to incriminating questions regarding the 1974 murder, I would hold his confession inadmissible because, in view of the circumstances under which he was interrogated, the State had a duty to prove that Murphy waived his privilege against self-incrimination, and it has not made such a showing.

## A

It is now settled that, in most contexts, the privilege against self-incrimination is not self-executing. "[I]n the ordinary case," if a person questioned by an officer of the State makes damaging disclosures instead of asserting his privilege, he forfeits his right to object to subsequent use of his admissions against him. *Garner* v. *United States*, 424 U. S., at 654. This forfeiture occurs even if the person is subject to a general legal duty to respond to the officer's questions. See *United States* v. *Washington*, 431 U. S. 181 (1977); *ante*, at 427. And it occurs regardless of whether the

person's failure to claim the privilege was founded upon a knowing and intelligent decision to waive his constitutional right not to answer those questions that might incriminate him. *Garner* v. *United States, supra,* at 654, n. 9; see also *ante,* at 427–428.

At first blush, this harsh doctrine seems incompatible with our repeated assertions of the importance of the Fifth Amendment privilege in our constitutional scheme. Twenty years ago, we observed:

> "[T]he American system of criminal prosecution is accusatorial, not inquisitorial, and . . . the Fifth Amendment privilege is its essential mainstay. . . . Governments, state and federal, are thus constitutionally compelled to establish guilt by evidence independently and freely secured, and may not by coercion prove a charge against an accused out of his own mouth." *Malloy* v. *Hogan,* 378 U. S., at 7–8 (citation omitted).

In view of our continued adherence to the foregoing principles,[12] it appears anomalous that, in most contexts, we allow governments to take advantage of witnesses' failure, sometimes as a result of ignorance or momentary inattention, to claim the benefit of the privilege in a "timely" fashion.

The explanation for our seemingly callous willingness to countenance forfeitures of Fifth Amendment rights must be sought in a combination of three factors. First and most importantly, we presume that most people are aware that they need not answer an official question when a truthful answer might expose them to criminal prosecution. "At this point in our history virtually every schoolboy is familiar with the concept, if not the language," of the constitutional ban on compelled self-incrimination. *Michigan* v. *Tucker,* 417 U. S. 433, 439 (1974). We thus take for granted that, in most instances, when a person discloses damaging informa-

---

[12] See, *e. g., Garner* v. *United States,* 424 U. S., at 655–656.

tion in response to an official inquiry, he has made an intelligent decision to waive his Fifth Amendment rights.

Second, in the vast majority of situations in which an officer of the State asks a citizen a question, the officer has no reason to know that a truthful response would reveal that the citizen has committed a crime. Under such circumstances, one of the central principles underlying the Fifth Amendment—that governments should not "deliberately see[k] to avoid the burdens of independent investigation by compelling self-incriminating disclosures"—has little relevance. *Garner* v. *United States, supra,* at 655–656. Thus, in the ordinary case, few constitutional values are threatened when the government fails to preface an inquiry with an explicit reminder that a response is not required if it might expose the respondent to prosecution.

Third, a general requirement that government officials preface all questions with such reminders would be highly burdensome. Our concern with the protection of constitutional rights should not blind us to the fact that, in general, governments have the right to everyone's testimony. *E. g., Branzburg* v. *Hayes,* 408 U. S. 665, 688 (1972). A rule requiring officials, before asking citizens for information, to tell them that they need not reveal incriminating evidence would unduly impede the capacity of government to gather the data it needs to function effectively.[13]

---

[13] It might be argued that no such general rule would be required to ensure that persons did not incriminate themselves without first making intelligent decisions to waive their constitutional rights. All that would be necessary would be a rule forbidding the State to make any use of a self-incriminating disclosure in a prosecution against its maker *unless* he had been reminded of his privilege before making the statement. The police (and other officials) would be free to ask questions without accompanying warnings. If a person questioned made damaging disclosures, the State could not use his statements against him, but the State would thereby be in no worse a position than if the questions had not been asked at all. The police would simply be obliged thereupon to conduct an independent inves-

In sum, a general rule requiring the prosecution, before introducing a confession, to prove that the defendant intelligently and voluntarily waived his right not to incriminate himself would protect few persons (because most know their legal rights), would do little to promote the values that underlie the Fifth Amendment, and would substantially impair the information-gathering capacity of government.[14]

It should be apparent that these considerations do not apply with equal force in all contexts. Until today, the Court has been sensitive to variations in their relevance and strength. Accordingly, we have adhered to the general principle that a defendant forfeits his privilege if he fails to assert it before making incriminating statements only in situations implicating several of the factors that support the principle. More specifically, we have applied the principle only in cases in which at least two of the following statements have been true: (a) At the time the damaging disclosures were made, the defendant's constitutional right not to make them was clearly established. (b) The defendant was given sufficient warning that he would be asked potentially incrimi-

---

tigation, and to secure a conviction on the basis of "evidence independently and freely secured," see *Malloy* v. *Hogan*, 378 U. S. 1, 8 (1964).

The response to the foregoing argument is that, in a situation of the sort just described, the State would indeed be in a significantly worse position than if the questions had not been asked. The reason is that, in a subsequent prosecution, the State would bear the burden of proving that it made no use whatever of the incriminating disclosures. See *Kastigar* v. *United States*, 406 U. S. 441, 460 (1972). The difficulty of sustaining that burden would often be such as wholly to frustrate prosecution. See Westen & Mandell, To Talk, To Balk, or To Lie: The Emerging Fifth Amendment Doctrine of the "Preferred Response," 19 Am. Crim. L. Rev. 521, 531–532 (1982). Desire to avoid such situations would induce government officials either to preface their questions with warnings or to refrain from asking them at all. The net effect would be to reduce the capacity of government to obtain needed information.

[14] Cf. *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 227–234, 242 (1973) (refusing, for similar reasons, to adopt a waiver standard for testing the voluntariness of consents to searches).

nating questions to be able to secure legal advice and to reflect upon how he would respond. (c) The environment in which the questions were asked did not impair the defendant's ability intelligently to exercise his rights. (d) The questioner had no reason to assume that truthful responses would be self-incriminating.

A review of a few of the leading cases should suffice to establish the point.[15] In *United States* v. *Kordel*, 397 U. S. 1 (1970), the Government submitted interrogatories to the defendant in a civil suit. Though the defendant (a corporate officer) was aware that the Government was planning to bring a criminal action against him, he answered the questions instead of asserting his privilege against self-incrimination. The Court ruled that his answers could be admitted in the ensuing prosecution. In so holding, the Court emphasized the facts that established law made clear that the defendant had a constitutional right to refuse to answer the interrogatories, that he was free to consult with counsel before responding, and that nothing in the circumstances under which the questions were presented impaired the defendant's ability to appreciate the consequences of his actions. *Id.*, at 7, 9–10.

The defendant in *Garner* v. *United States*, 424 U. S. 648 (1976), was a professional gambler who made incriminating disclosures on his Form 1040 income tax returns. The Court held that he could be prosecuted partly on the basis of his admissions. Though the defendant's constitutional right to refuse to provide the requested information was perhaps less clear and straightforward than the right of the usual defendant, the Court stressed that other factors rendered inexcusable his failure to learn and assert his entitlements. Thus,

---

[15] I do not renounce the views I expressed in concurrence or dissent in several of the cases discussed below. My purpose in canvassing the relevant decisions is simply to demonstrate that, even under the analysis adopted by the majorities in those cases, the result reached by the Court today is wrong.

the Court pointed out that the defendant was free to consult with a lawyer and could fill out the tax return at his leisure in an environment of his choosing. *Id.*, at 658. Moreover, every taxpayer is required to fill out a Form 1040; the Government, in imposing that duty, has no reason to assume that any given taxpayer's responses will be self-incriminating.[16] Thus, the United States in *Garner* could not be faulted for requesting the information that the defendant provided.

Finally, in *United States* v. *Washington*, 431 U. S. 181 (1977), the Court confirmed the proposition that a witness called to testify before a grand jury must claim the benefit of the privilege or forfeit it.[17] The Court acknowledged that "the grand jury room engenders an atmosphere conducive to truthtelling" and thus might have exerted some pressure on the defendant not to assert his rights. *Id.*, at 187. In addition, the Court recognized that the Government was not blameless insofar as a criminal investigation had focused on the defendant and thus the questioners had ample reason to believe that truthful answers by the defendant would be self-incriminating.[18] But, the Court reasoned, the situation con-

---

[16] Cf. *United States* v. *Oliver*, 505 F.2d 301, 306–308 (CA7 1974) (Stevens, J.) (distinguishing, for Fifth Amendment purposes, income reporting statutes "designed to procure incriminating disclosures from a select group of persons engaged in criminal conduct" and reporting statutes "applicable to the public at large, . . . [whose] demands for information are neutral in the sense that they apply evenly to the few who have illegal earnings and the many who do not").

[17] Prior to *Washington*, that proposition had frequently been advanced in dictum. See, *e. g., United States* v. *Mandujano*, 425 U. S. 564, 574–575 (1976) (dictum); *Rogers* v. *United States*, 340 U. S. 367, 370 (1951) (alternative holding); *United States* v. *Monia*, 317 U. S. 424, 427 (1943) (dictum).

[18] JUSTICE BRENNAN and I remain convinced that the fact that a criminal investigation has focused on a grand jury witness is sufficient to tip the constitutional balance in favor of a requirement that the prosecution prove that any damaging disclosures made by the witness were founded upon a knowing and intelligent waiver of the witness' rights. See 431 U. S., at 191 (BRENNAN, J., joined by MARSHALL, J., dissenting); *United States* v. *Mandujano, supra,* at 596–602 (BRENNAN, J., joined by MARSHALL, J.,

tained other safeguards that warranted adherence to the principle that a privilege not asserted is lost.  First, the defendant's right to refuse to respond had been perfectly clear; indeed, at the outset of the proceeding, the defendant had been explicitly warned of his right not to answer questions if his responses might incriminate him.  *Id.*, at 186, 188.[19]  Second, not only had the defendant been afforded an opportunity before appearing to seek legal advice, but also, at the start of the hearing, he was told that a lawyer would be provided for him if he wished and could not afford one.  *Id.*, at 183–184.  Under those circumstances, the Court concluded that it was inconceivable that the defendant's decision not to assert his privilege was uninformed or involuntary.[20]

---

concurring in judgment).  However, the argument advanced in the text does not depend upon that conviction.

[19] The Court declined, however, to decide whether such warnings were constitutionally required.  431 U. S., at 186, 190.

[20] See also *United States ex rel. Vajtauer* v. *Commissioner of Immigration*, 273 U. S. 103, 113 (1927) (defendant who made incriminating disclosures when questioned by an immigration inspector deemed (in dictum) to have waived his privilege when his right to refuse to answer was clear, he had been given adequate notice of the sort of questions he would be asked, and he was represented by counsel at the hearing); *United States* v. *Murdock*, 284 U. S. 141, 148 (1931) (when defendant was summoned to appear before revenue agent, consulted with counsel just prior to the interview, and clearly had a right not to incriminate himself, his failure to invoke the Fifth Amendment as a justification for his refusal to answer resulted in a waiver of his privilege) (dictum); *Beckwith* v. *United States*, 425 U. S. 341 (1976) (incriminating disclosures made by taxpayer who was interviewed in his home and place of business by Internal Revenue agents after being reminded of his Fifth Amendment rights held admissible in a prosecution against him); *Oregon* v. *Mathiason*, 429 U. S. 492 (1977) *(per curiam)* (parolee's confession to a police officer held admissible where parolee was not in custody at the time of the questioning, parolee had ample warning that he would be asked incriminating questions, and parolee was clearly entitled to refuse to respond); *Roberts* v. *United States*, 445 U. S. 552, 559 (1980) (in a case in which the Government had "no substantial reason to believe that the requested disclosures [were] likely to be incriminating," and the defendant clearly had a right not to incriminate himself, the defendant's

By contrast, in cases in which only one of the statements
enumerated above, see *supra*, at 452–453, has been true, the
Court has refused to adhere to the general rule that a privi-
lege not claimed is lost, and instead has insisted upon a show-
ing that the defendant made a knowing and intelligent de-
cision to forgo his constitutional right not to incriminate
himself. The classic situation of this sort is custodial interro-
gation. In *Miranda* v. *Arizona,* 384 U. S. 436 (1966), the
Court acknowledged that the right of a suspect in police cus-
tody not to answer questions is well established. However,
we stressed that other aspects of the situation impair the
ability of the suspect to exercise his rights and threaten the
values underlying the Fifth Amendment: the suspect is un-
able to consult with counsel regarding how he should respond
to questions; the environment in which the questions are pre-
sented (the police station, from which the suspect is forbid-
den to leave) "work[s] to undermine the individual's will to
resist and to compel him to speak where he would not other-
wise do so freely," *id.*, at 467; and the interrogators are well
aware that truthful answers to their questions are likely to
incriminate the suspect. In short, only one of the four cir-
cumstances favoring application of the general principle exist
in the context of custodial interrogation. To mitigate the
risk that suspects would ignorantly or involuntarily fail to
claim their privilege against self-incrimination under these
circumstances, the Court in *Miranda* imposed a requirement

---

refusal to answer *without* asserting his privilege held properly used against
him in the determination of his sentence).

The presence of two of the four safeguards likewise legitimates the set-
tled principle that a citizen not in custody who is asked potentially incrimi-
nating questions by a police officer must claim the benefit of the Fifth
Amendment instead of answering if he wishes to retain his privilege.
*Miranda* v. *Arizona,* 384 U. S. 436, 477–478 (1966). Under such circum-
stances, not only does the citizen have a well-established right to refuse to
answer, but also the environment is not such as to discourage or frustrate
the assertion of his right. See *id.*, at 478.

that they be shown to have freely waived their rights after being fully apprised of them. *Id.*, at 475–479.[21]

## B

If we remain sensitive to the concerns implicit in the foregoing pattern of cases, we should insist that the State, in the instant case, demonstrate that Murphy intelligently waived his right to remain silent. None of the four conditions that favor application of the principle that a defendant forfeits his privilege if he fails to claim it before confessing can be found in the circumstances under which Murphy was interrogated. First, the existence and scope of Murphy's constitutional right to refuse to testify were at best unclear when he ap-

---

[21] A less well-known situation involving a similar paucity of safeguards against inadvertent or uninformed abandonment of constitutional rights is that presented in *Smith* v. *United States*, 337 U. S. 137 (1949), and *Emspak* v. *United States*, 349 U. S. 190 (1955). In each case, the defendant was summoned to testify before an official body, appeared, and early in the proceeding invoked his privilege against self-incrimination. Questioning continued (in one case under a grant of immunity, in the other on unrelated topics). Later in the proceeding, the defendant was asked whether he wished to claim the privilege with regard to a specific substantive question. In each case, three factors reduced the defendant's ability, at that point, intelligently to exercise his constitutional rights and rendered the activities of his interrogators constitutionally suspect: the defendant's right to refuse to answer the question at issue was unclear; the environment in which the questions were presented was moderately coercive; and the nature of the proceeding as well as the defendant's prior assertion of his privilege against self-incrimination alerted the questioner to the likelihood that a truthful answer to the crucial question would expose the defendant to criminal liability. In both cases, the Court held that the defendant could be prosecuted on the basis of his answer to the decisive question only if the Government were able to demonstrate that he had made a sufficiently unequivocal and intelligent waiver of his Fifth Amendment rights to satisfy the standard enunciated in *Johnson* v. *Zerbst*, 304 U. S. 458, 464 (1938) ("an intentional relinquishment or abandonment of a known right or privilege"). In both instances, the Court concluded that the Government had failed to make such a showing, and therefore reversed the defendant's conviction.

peared in the probation officer's office. It is undisputed that the conditions of Murphy's probation imposed on him a duty to answer all questions presented by his probation officer except those implicating his Fifth Amendment rights.[22] What exactly those rights were was far from apparent. The majority opinion in this case constitutes the first authoritative analysis of the privilege against self-incrimination available to a probationer. The ambiguity of scope of that privilege prior to today is suggested by the fact the Solicitor General, appearing for the United States as *amicus curiae*, seriously misconceived the rights that might have been asserted by Murphy when examined by his probation officer.[23] If, after being afforded substantial opportunity for research and reflection, the lawyers who represent the Nation err in their explication of the relevant constitutional principles, Murphy surely cannot be charged with knowledge of his entitlements.[24]

---

[22] The majority construes Murphy's probation conditions to impose on him a general duty to respond to questions, but to contain an exemption for questions that impinged upon his Fifth Amendment rights. *Ante*, at 436–437. The State of Minnesota, in its brief in this case, adopts the same interpretation. See Brief for Petitioner 36–38 (arguing that probationers in Minnesota are obliged to answer all questions asked by their probation officers except those to which they may assert "valid" claims of privilege). Though I find that construction implausible, see Part I, *supra*, I assume it for present purposes. The point made here is simply that, at the time Murphy was interrogated, the scope of his Fifth Amendment rights—and therefore the scope of the hypothesized exemption from the general duty to answer—was ambiguous.

[23] The Solicitor General argued in the alternative that, "[w]hen a person has been convicted of a crime, his constitutional rights can be limited to the extent reasonably necessary to accommodate the government's penal and rehabilitative interests," and therefore that the government may constitutionally exert upon a probationer pressures to incriminate himself that it could not exert upon a citizen who had not been convicted of a crime. Brief for United States as *Amicus Curiae* 8; see *id.*, at 27–32. That proposition is rejected by the Court today.

[24] Cf. *Maness* v. *Meyers*, 419 U. S. 449, 466 (1975) ("A layman may not be aware of the precise scope, the nuances, and boundaries of his Fifth Amendment privilege").

Second, contrary to the suggestion of the majority, *ante*, at 432, Murphy was given no warning that he would be asked potentially incriminating questions. The letter in which Murphy's probation officer instructed him to make an appointment informed him that the purpose of the meeting was "[t]o further discuss a treatment plan for the remainder of [his] probation." App. to Pet. for Cert. C–36. In view of the fact that Murphy remained under a legal obligation to attend treatment sessions,[25] there was no reason why he should have assumed from the letter that the officer planned to question him regarding prior criminal activity.[26] In short, prior to the moment he was asked whether he had committed the murder, Murphy had no reason to suspect that he would be obliged to respond to incriminating questions. He thus had no opportunity to consult a lawyer, or even to consider how he should proceed.

Third, the environment in which the questioning occurred impaired Murphy's ability to recognize and claim his constitutional rights. It is true, as the majority points out, that the discussion between a probation officer and a probationer is likely to be less coercive and intimidating than a discussion between a police officer and a suspect in custody. *Ante*, at 433. But it is precisely in that fact that the danger lies. In contrast to the inherently adversarial relationship between a suspect and a policeman, the relationship between a probationer and the officer to whom he reports is likely to incorporate elements of confidentiality, even friendship. Indeed, many probation officers deliberately cultivate such bonds

---

[25] Contrary to the majority's suggestion, *ante*, at 432, nothing in the record indicates that the probation officer had "excused" Murphy from the condition of probation that required him "to pursue . . . Alpha treatment," App. to Pet. for Cert. C–35; the Minnesota Supreme Court found merely that she had agreed not to seek revocation of his probation because of his breach of that condition, see 324 N. W. 2d 340, 341 (1982).

[26] Indeed, for reasons discussed *infra*, at 460, it appears that the letter was shrewdly designed to *prevent* Murphy from discerning in advance the true purpose of the meeting.

with their charges.[27]   The point should not be overstated; undoubtedly, few probationers are entirely blind to the fact that their probation officers are "peace officer[s], . . . allied, to a greater or lesser extent, with [their] fellow peace officers."  *Fare* v. *Michael C.*, 442 U. S. 707, 720 (1979).   On the other hand, many probationers develop "relationship[s] of trust and cooperation" with their officers.  *Id.*, at 722.[28] Through abuse of that trust, a probation officer can elicit admissions from a probationer that the probationer would be unlikely to make to a hostile police interrogator.

The instant case aptly illustrates the danger.   Before she sent her letter to Murphy asking him to make an appointment, the probation officer had decided to try to induce him to confess to the 1974 killing and to turn over that information to the police.   She was aware that, if she were successful, Murphy would soon be arrested and tried for murder.[29] There was thus no prospect whatsoever that the information she elicited would be used to design a treatment program to be followed by Murphy during the remainder of his probation.   Yet, in her letter, she described the purpose of the meeting as that of "discuss[ing] a treatment plan."   When Murphy arrived at the meeting, she persisted in the deceit; instead of informing him at once what she intended to do with his anticipated confession to the 1974 murder, she told him

---

[27] See A. Smith & L. Berlin, Introduction to Probation and Parole 116–119 (1979); Mangrum, The Humanity of Probation Officers, 36 Fed. Probation 47 (June 1972); Note, Observations on the Administration of Parole, 79 Yale L. J. 698, 704–708 (1970); *People* v. *Parker*, 82 App. Div. 2d 661, 667, 442 N. Y. S. 2d 803, 807 (1981), aff'd, 57 N. Y. 2d 815, 441 N. E. 2d 1118 (1982).

[28] The relationship at issue in *Fare* was that between a probation officer and a juvenile probationer.   But many of the Court's observations can be extended to the relationship between an officer and an adult probationer. See n. 27, *supra*.

[29] Indeed, when Murphy refused to turn himself in, it was his probation officer who secured the order for his arrest.

that "her main concern was to talk to him about the relationship of the prior crime and the one of which he was convicted and about his need for treatment under the circumstances." 324 N. W. 2d 340, 341 (Minn. 1982). That Murphy succumbed to the deception is apparent from the sequence of his responses. Instead of denying responsibility for the 1974 killing, he admitted his guilt but sought to explain that extenuating circumstances accounted for that crime. Because those circumstances no longer existed, he argued, he had no need for further treatment. Only after Murphy had made his confession did the officer inform him of her intent to transmit that information to the police. In short, the environment in which the interview was conducted afforded the probation officer opportunities to reinforce and capitalize on Murphy's ignorance that he had a right to refuse to answer incriminating questions, and the officer deliberately and effectively exploited those opportunities.

Finally, it is indisputable that the probation officer had reason to know that truthful responses to her questions would expose Murphy to criminal liability. This case does not arise out of a spontaneous confession to a routine question innocently asked by a government official. Rather, it originates in precisely the sort of situation the Fifth Amendment was designed to prevent—in which a government, instead of establishing a defendant's guilt through independent investigation, seeks to induce him, against his will, to convict himself out of his own mouth.

In sum, none of the factors that, in most contexts, justify application of the principle that a defendant loses his Fifth Amendment privilege unless he claims it in a timely fashion are present in this case. Accordingly, the State should be obliged to demonstrate that Murphy knew of his constitutional rights and freely waived them. Because the State has made no such showing, I would hold his confession inadmissible.

## III

The criminal justice system contains safeguards that should minimize the damage done by the Court's decision today. In the future, responsible criminal defense attorneys whose clients are given probation will inform those clients, in their final interviews, that they may disregard probation conditions insofar as those conditions are inconsistent with probationers' Fifth Amendment rights. The attorneys will then carefully instruct their clients on the nuances of those rights as we have now explicated them.[30] Armed with this knowledge, few probationers will succumb to the sort of pressure and deceit that overwhelmed Murphy.

Because Murphy himself had the benefit of none of the safeguards just described, I would affirm the judgment of the Supreme Court of Minnesota that the admission into evidence of the disclosures he made to his probation officer violated the Constitution.

I respectfully dissent.

---

[30] It is to be hoped, moreover, that persons currently on probation who are no longer represented by counsel will somehow be informed of the central principle established by the Court's decision: that a probationer has a right to refuse to respond to a question the answer to which might expose him to criminal liability unless he is granted immunity from the use of his answer against him in a subsequent criminal prosecution.