Jefferson Andrew LYKINS, Appellant,

v.

The STATE of Texas, Appellee.

No. 963–87.

Court of Criminal Appeals of Texas, En Banc.

Nov. 8, 1989.

Rehearing Denied Jan. 31, 1990.

Kurt B. Wentz, Houston, for appellant.

Jim Mapel, Dist. Atty. & Jim Turner, Asst. Dist. Atty., Angleton, Robert Huttash, State's Atty., Austin, for the State.

Opinion on Appellant's Petition for Discretionary Review

CAMPBELL, Justice.

Appellant was convicted by a jury of aggravated assault. After finding two enhancement allegations to be true, the jury sentenced appellant to 99 years confinement in the Texas Department of Corrections. In an unpublished opinion, the Fourteenth Court of Appeals affirmed appellant's conviction, holding: (1) that statements made by appellant to prison officials, and introduced to impeach appellant's testimony, were voluntarily made and, thus, properly admitted; and (2) that giving the jury the statutory parole instruction was not error because Art. 37.07 § 4 V.A.C.C.P. is constitutional. *Lykins v. State*, 1987 WL 14568 (Tex.App.—Houston [14th] No. C14-85-00966-CR delivered July 23, 1987). We granted appellant's petition for discretionary review in order to determine: (1) whether the Court of Appeals erred in holding that admission of appellant's statements for impeachment purposes was consistent with our state and federal constitutions and Art. 38.22 V.A.C.C.P; and (2) whether the Court of Appeals erred in holding that Art. 37.07 § 4 V.A.C.C.P. was constitutional. We hold that the Court of Appeals erred in holding that appellant's statements were admissible and will not reach the question concerning the parole law instruction.

At the time of the offense, appellant was an inmate at the Texas Department of Corrections' Retrieve Unit. Complainant, Al-

vin Dekle, also an inmate at the Retrieve Unit, was in the dining hall at approximately 5:30 p.m. on the evening of the offense. After Dekle finished eating, he left the table, carrying his tray, preparing to leave the dining hall. Dekle testified that he saw appellant waiting in the serving line. Appellant motioned for Dekle to come over to him, and when Dekle was a few feet from appellant, appellant thrusted at him, stabbing Dekle in the chest, just below the ribs. Dekle testified that appellant was a member of the Texas Aryan Brotherhood, a prison gang. Dekle had refused appellant's request to smuggle controlled substances into the Retrieve Unit on behalf of the Aryan Brotherhood. He suggested that this refusal, his refusal to join the gang, and the fact that he had played on a basketball team with black inmates [1] could have provided the motive for appellant's attack.

Appellant related a different account of the incident. Appellant testified that he was standing in the serving line when he noticed Dekle approach him in a rapid manner. Appellant said that the rapidity of Dekle's approach alarmed him because it was unusual for anyone to move in such a manner unless he was intending to attack. In addition, appellant said that Dekle had a hand in his pocket, as if readying a weapon. Appellant said that he reached into his own pocket and readied his "shank," a home-made knife, in preparation for an attack from Dekle. When Dekle was approximately three feet away, appellant said that he drew his weapon and stabbed Dekle. Appellant denied membership in, and even the existence of, a group called the Texas Aryan Brotherhood. He did, however, acknowledge membership in the Aryan Nations Church. Appellant suggested that Dekle's reason for attacking him might be related to animosity continuing from the time that he was appellant's cellmate, appellant's refusal to provide Dekle with a membership form for the church, or appellant's refusal to provide commissary items to Dekle.

Within an hour of the incident, Major Pelz, of the Texas Department of Corrections, interviewed the appellant about the stabbing. Pelz investigated appellant because Dekle had identified him as his assailant and because of Pelz's belief that the appellant was a gang member. Pelz testified that appellant told him that the stabbing was "discipline." At a second interview, later that day, appellant told Pelz that the stabbing did not occur in the manner that Pelz recounted it. He also told Pelz that no blood would be found on the knife or appellant's clothes. Finally, in preparation for an internal disciplinary hearing, appellant prepared and submitted a written statement.[2] Appellant was not

---

1. Testimony revealed that the Aryan Brotherhood is a white supremacist organization that desires, among other things, to enforce racial segregation. Thus, Dekle's acceptance of black inmates would have been an affront to Aryan Brotherhood's racist tenets.

2. The statement, as admitted into evidence, said:

To be entered into recoras [sic] and submitted as evidence on my behalf concerning Disciplinary Report [illegible] 19195, filed by Major Pelz on 7/19/84 on the Retrieve Unit aginst [sic] myself, Jeff Lykins #311825. I am charged with Code 95, aggravated assult [sic] on inmate with a weapon on 7/15/84.

First, in relation to charges against me I would like to point out that all evidence listed by Major Pelz on the Disciplinary Report are total hearsay and speculation. There is no concrete evidence whatsoever proving I committed this act, only Major Pelz [sic] statement that inmate Dekle told him I assulted [sic] him. Also I might say that whatever inmate Dekle said at such a time of injury may have easily been misconstrued or misinterpreted. There are no actual eye-witnesses [sic] against me as this is understandable since I did not do it! I have three (3) witnesses however that were situated in different and various places in the dining [sic] and that will testify that I did not commit this act. I have more witnesses if necessary, however I am told by T.D.C. officers that I allowed [sic] only three (3) witnesses.

Contrary to Major Pelz [sic] report that says I was uncooperative when interviewed (I told Maj. Pelz everything I knew) about the matter but he would not·accept this.

I would also like to point out as the weapon described in the report is mentioned in Major Pelz [sic] own words as "possibly the one used in the stabbing", which is no evidence whatsoever. Are my fingerprints on it, is inmate Dekles [sic] blood on it, did anyone see me use it, have it in my possession or deposit it anywhere? No, they did not because I never had a weapon or assaulted inmate Dekle!

warned that his statements might be used against him in a criminal proceeding. Testimony concerning the first two statements and the text of the third statement were admitted into evidence during the State's rebuttal. They were deemed relevant because they were prior statements which were inconsistent with appellant's testimony at trial.

The Court of Appeals noted that the trial judge entered the following finding in the record concerning appellant's written statement:

> Court finds that although he was not warned at the time of making the statement, that (he) did not have the benefit of counsel, that he nevertheless made the statement, that the statement does not stand for custodial interrogation, that it is a voluntary statement, that it has bearing on the credibility of the accused as a witness.

*Lykins*, slip. op. at 3. In regard to the oral statements, the trial court stated:

> The Court finds that although the defendant was not given Miranda warnings at the time, his statement was nevertheless freely and voluntarily given;
>
> That, further, it does have a bearing upon the [defendant's] credibility as the

accused is a witness in this particular trial.

> And we find it to have been made voluntarily.

*Lykins*, slip op. at 4. The Court of Appeals went on to state that its own review of the record lead it to agree with the trial court's findings. Without further analysis, the Court of Appeals concluded that, because the statements were voluntary, they were properly admitted into evidence.

Now, appellant makes three arguments as to why his statements should not have been admitted. First, he argues that the statements were inadmissible because he was not given the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Second, he argues that introduction of the his statements is in violation of Art. 38.22, §§ 2 & 3 V.A.C.C.P. Third, he argues that use of an involuntary statement, even for impeachment purposes, is a denial of due process. We will address each argument separately.

■ First, appellant argues that his statements were taken in violation of *Miranda v. Arizona*. We need not determine whether warnings were given to appellant or whether his statements were the prod-

---

The weapon in mention should be examined for prints or blood before it is even attempted to be used aginst [sic] me as evidence! (Also no blood was found on my clothes!)

My personal account of the incident in mention is as follows: I was standing in the serving line in the dining hall approximately two (2) to three (3) feet from the silver ware cart right where the railing starts in front of the first item served on the line. When I heard a noise like a tray falling on the floor, when I looked towards the noise I saw inmate Dekle holding his abdomen and walking backwards. At the time this happened I would like to point out that I was approximately ten (10) feet from inmate Dekle which I can prove and my witnesses will testify to. Also that there were several inmates between inmate Dekle and I at all times! this [sic] summs [sic] up the only knowledge I have on this incident, but Major Pelz seems adamant in pinning this charge on me and has acted in a very hostile and belligerent manner towards me the whole time. I feel personally the reason behind all of this being directed towards myself is the *FACT* that I am a known writ-writer and prison reform activist and have been for several years. I have had nu-

merous interviews with Monitors from the Special Masters [sic] Office, F.B.I. agents, and paralegals Paula Bushon and given them all statements concerning all sorts of cruel and inhumane treatment and conditions here in T.D.C., misconduct of T.D.C. officials, brutality, violations of civil rights, court orders and breaking criminal laws. I even testified against ex-Major Carranza in Federal Court and since then he was fired from T.D.C. off of this very unit! In view of these facts in relation to the present action brought against me I think it is very clear that this action towards me is an act of retaliation and harassment in its purest and simplest form.

In conclusion I would like to say that after reviewing the facts and evidence for and against me in this Disciplinary action even a child could see that I am not guilty! And if necessary, for the record, I will request a polygraph test for myself, Major Pelz, and officer C. Thompson who was right there at the scene of the incident, who even indicated it was not me who did the stabbing and also that since then Major Pelz told officer [sic] Thompson to "keep his mouth shut" about what he saw!

/s/ Jeff Lykins # 311825

uct of custodial interrogation because the statements were introduced during the State's rebuttal and were introduced for purposes of impeachment. In *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the Supreme Court decided that unwarned statements may be introduced to impeach the testimony of a defendant.

Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. Had inconsistent statements been made by the accused to some third person, it could hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment.

The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances. We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier conflicting statements.

*Harris*, 401 U.S. at 225–26, 91 S.Ct. at 645–46. Here, the state used appellant's prior inconsistent statements as impeachment. Under these circumstances admission of appellant's statements does not constitute a *Miranda* violation; therefore, appellant's first contention is without merit.

Second, appellant argues that Art. 38.22 V.A.C.C.P. prohibits admission of his statements. Art. 38.22 provides, in part:

Sec. 5. *Nothing in this article precludes the admission* of a statement made by the accused in open court at his trial, before a grand jury, or at any examining trial in compliance with Articles 16.03 and 16.04 of this code, or of a statement that is the res gestae of the arrest or of the offense, or of a statement that does not stem from custodial interrogation, or *of a voluntary state-ment, whether or not the result of custodial interrogation, that has bearing upon the credibility of the accused as a witness,* or of any other statement that may be admissible under law. [emphasis added]

Thus, on the facts of this case, Art. 38.22 only requires that appellant's statement was voluntary. Because appellant's third contention under this ground for review is that his statements were not voluntary, we will address the merits of this second contention along with appellant's third contention.

Third, appellant argues that his statement's were obtained involuntarily and were, thus, inadmissible. Appellant's contention correctly states the law. The holding in *Harris v. New York*, 401 U.S. at 222, 91 S.Ct. at 644, notwithstanding, a defendant's statement which is not voluntary, may not be used to impeach him. *Mincey v. Arizona*, 437 U.S. 385, 397–98, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978). Therefore, resolution of appellant's final two contentions concerning his statements requires a determination concerning the voluntariness of those statements.

Appellant's statements may be divided into two types, oral and written. For ease of analysis, we will separate appellant's statements in this manner and examine them individually.

Appellant's written statement was not made in response to any question and was apparently motivated by his belief that the statement would help his case in the disciplinary hearing. An inmate is not required to answer questions, make a statement, or even attend a disciplinary proceeding against him. See TDC Disciplinary Rules and Procedures for Inmates VI(A) & (B) (1986) (hereinafter: *T.D.C. Regulations*).

Appellant argues specifically that the consequences of the disciplinary hearing were so great that he was effectively compelled to provide a written statement. This position is untenable. Virtually every confession or statement made by an accused is the product of his, or counsel's, belief that the statement will be of benefit in facing

the charges against him. If accepted, appellant's argument would effectively bar admission of all confessions, in and out of court. Clearly, this result is not mandated by the federal or state constitution nor by statute. In view of the trial court's finding that there were no inducements, threats, or attempts to force appellant's written statement, we hold that the written statement was voluntary and, thus, properly admitted for impeachment purposes.

■ We find however, that appellant's oral statements to Major Pelz were not given voluntarily. Texas Department of Corrections regulations make "failing or refusing to respond to an officer's questions" a "Level 3" offense. *T.D.C. Regulations*, supra at TDC Disciplinary Offenses (Level 3 Offenses) (32). Had appellant refused to respond to Major Pelz's questions, Rule 32 would have authorized that appellant be penalized by loss of one year of good conduct time, reduction in his time-earning class, loss of privileges, suspension of contact visitations, suspension of non-contact visitation, cell restriction, extra duty, punitive segregation, or any combination of these. *T.D.C. Regulations*, supra at VII(A).

■ When a direct penalty may be imposed for failure to answer a question, a defendant need not invoke his privilege against self-incrimination and does not waive the privilege by merely answering a question put to him.

> The general rule that the privilege must be claimed when self-incrimination is threatened has also been deemed inapplicable in cases where the assertion of the privilege is penalized so as to 'foreclos[e] a free choice to remain silent, and … compe[l] … incriminating testimony.' [quoting *Garner v. United States*, 424 U.S. 648, 661, 96 S.Ct. 1178 [1186] 47 L.Ed.2d 370 (1976)]

\*   \*   \*   \*   \*   \*

In each of the so-called 'penalty' cases, the State not only compelled an individu-al to appear and testify, but also sought to induce him to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.' [quoting *Lefkowitz v. Cunningham*, 431 U.S. 801, 806, 97 S.Ct. 2132 [2136] 53 L.Ed.2d 1 (1977)] *Minnesota v. Murphy*, 465 U.S. 420, 434–35, 104 S.Ct. 1136, 1146, 79 L.Ed.2d 409 (1984). Thus, because Department of Corrections regulations could have punished appellant for invoking his right not to incriminate himself, the privilege, in this instance, was self-executing.

Because the Department of Corrections attached a penalty for appellant's failure to respond to Major Pelz's questions, the resulting answers were compelled within the meaning of the federal constitution. See *Minnesota v. Murphy*, 465 U.S. at 437–38, 104 S.Ct. at 1147–48.

The United States Supreme Court has held that inmates may be compelled to testify at disciplinary hearings, if the compulsion is accompanied by a grant of use immunity for outside proceedings. *Baxter v. Palmigiano*, 425 U.S. 308, 316, 96 S.Ct. 1551, 1557, 47 L.Ed.2d 810 (1976).

> Prison disciplinary hearings are not criminal proceedings; but if inmates are compelled in those proceedings to furnish testimonial evidence that might incriminate them in later criminal proceedings, they must be offered 'whatever immunity is required to supplant the privilege' and may not be required to 'waive such immunity.'

*Baxter*, 425 U.S. at 316, 96 S.Ct. at 1557. Because appellant's testimony was used in court, we know that either there was no immunity offered or that the immunity agreement was breached. Thus, use of appellant's oral statements was in violation of his Fifth and Fourteenth Amendment rights.

The judgments of the Court of Appeals and the trial court are reversed and the cause is remanded to the trial court for action consistent with this opinion.[3]

---

**3.** Because of our disposition of this ground for review, we need not address appellant's remain-ing contention.

WHITE and BERCHELMANN, JJ., concur.

TEAGUE, J., dissents.