UNITED STATES, Appellee,

v.

Staff Sergeant Amante B. RAMELB,
575–02–2803, United States
Army, Appellant.

ARMY 9401024.

U.S. Army Court of Criminal Appeals.

18 June 1996.

For Appellant: Captain Michael E. Hatch, JA (argued); Major Michael A. Egan, JA (on brief); Captain Norman R. Zamboni, JA.

For Appellee: Captain John W. O'Brien, JA (argued); Colonel John M. Smith, JA; Lieutenant Colonel Eva M. Novak, JA (on brief).

Before EDWARDS, ARQUILLA, and GONZALES, Appellate Military Judges.

## OPINION OF THE COURT ON RECONSIDERATION

ARQUILLA, Judge:

At a general court-martial, the appellant was ultimately tried on four specifications of larceny in violation of Article 121, Uniform Code of Military Justice, 10 U.S.C. § 921 (1988).[1] He pleaded guilty by exceptions and substitutions to a lesser offense of wrongful appropriation as to each specification. A court of officer and enlisted members found him guilty of larceny as to all specifications and sentenced him to a bad-conduct discharge, confinement for three years, forfeiture of all pay and allowances, and reduction to Private E1. The convening authority approved the sentence, but suspended that portion of the sentence adjudging confinement in excess of eighteen months for a period of eighteen months.[2]

This court issued an opinion in this case on 21 March 1996 affirming the findings and sentence. On 10 April 1996, the government requested that the court reconsider en banc its decision because the judicial policy announced in that decision allegedly conflicted with decisions of the United States Court of Appeals for the Armed Forces. We disagree. Nevertheless, the request for reconsideration was granted in order to elaborate further upon the reasoning behind this judi-

cial policy.[3] The suggestion for reconsideration en banc was not adopted by the court.

■ The appellant has assigned three errors, only one of which warrants discussion.[4] The appellant asserts that his Fifth Amendment privilege against self-incrimination was violated when the military judge allowed statements made by the appellant during the *Care* inquiry[5] into the appellant's pleas of guilty to wrongful appropriation to be used by the government to prove the greater offenses of larceny. We hold, as a matter of judicial policy, that an accused's statements during a guilty plea inquiry cannot be considered as evidence for or against an accused on the remaining contested elements or charges to which a plea of not guilty has been entered. Furthermore, while we agree in this case that the appellant's statements during the *Care* inquiry should not have been used against him at trial, we find any error that occurred by introducing his statements was waived by his counsel's failure to object, and, in any event, was harmless beyond a reasonable doubt.

Before inquiring into the providence of the appellant's plea of guilty to wrongful appropriation, the military judge advised the appellant that by pleading guilty he gave up, among other rights, his "right against self-incrimination; that is, his right to say nothing at all." The military judge further advised the appellant that he gave up "these rights solely with respect to the issue of guilt or innocence, and only with respect to the offenses to which [he] pled guilty." Later he advised the appellant that he would be placed under oath and that "[a]nything [he told the judge] may be used against him in the sentencing portion of trial."[6]

1. These four specifications represented a consolidation of twenty-three separate specifications of larceny which were referred to trial.

2. The plea of guilty to each lesser offense of wrongful appropriation was entered pursuant to a pretrial agreement which allowed the government to present evidence as to the greater offense of larceny. The convening authority's action in suspending a portion of the adjudged confinement was not required by the pretrial agreement.

3. Accordingly, the opinion of 21 March 1996 was vacated by our order granting reconsideration.

4. Pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), the appellant also raised the issue of sentence appropriateness, which we find to be without merit.

5. *United States v. Care*, 18 U.S.C.M.A. 535, 40 C.M.R. 247 (1969). *See* Rule for Courts–Martial 910(e) [hereinafter R.C.M.].

6. In contrast, the military judge advised the appellant that the stipulation of fact he signed pursuant to his pretrial agreement with the convening authority could be used by the court to determine his guilt or innocence of the greater

Through his plea of guilty to each lesser offense of wrongful appropriation, the appellant admitted all the elements of the corresponding greater offense of larceny except one—that is, that the taking by the appellant was "with the intent permanently to deprive or defraud another person of the use and benefit of the property or permanently to appropriate the property for the use of the [appellant] or for any person other than the owner." Manual for Courts–Martial, United States, 1984, Part IV, para. 46b(1)(d) [hereinafter MCM, 1984]. Wrongful appropriation, on the other hand, requires only an intent "temporarily" to deprive or defraud another of the use or benefit of their property. MCM, 1984, para. 46b(2)(d). Therefore, the only element at issue at trial was the appellant's intent at the time of—or following—his wrongful taking of money from the government.

During the guilty plea inquiry, the appellant informed the military judge that he was the chief of the control section of an Army finance office at Wiesbaden Air Base in Germany. In this capacity, he had access to the computer system which created pay accounts for soldiers. In August 1992, the appellant created two military pay accounts using the names and social security numbers of fictitious soldiers, each in the pay grade of E4. His reason for doing this, as the appellant later testified, was to test the system to determine whether it was fraud-proof. Over the following twelve months, the Defense Finance and Accounting Service (DFAS) pro-

vided the appellant one check for approximately $5,500.00 on behalf of one fictitious soldier (which the appellant cashed) and, on behalf of both fictitious soldiers, made numerous direct deposits totaling about $22,-500.00 into a savings account the appellant established for himself and his father-in-law. The appellant's father-in-law was his military dependent, and resided with him and other members of the appellant's family in Germany. In response to the military judge's questions as to what happened to the money after it was deposited in the account he shared with his father-in-law, the appellant stated that he (the appellant) "would withdraw it from the account" and "set it aside." When the military judge asked the appellant what he meant,[7] the appellant, after conferring with his counsel, stated that he "spent it and some of it we just, you know, hold for cash."

After the guilty plea inquiry by the military judge, the government provided notice that it intended to present the testimony of Captain (CPT) Carr, a spectator in the courtroom who had witnessed the appellant's statements during the plea inquiry. When CPT Carr testified on the merits, appellant's trial defense counsel did not object.[8] Captain Carr testified that, among other statements made during the plea inquiry,[9] the appellant stated that he spent some of the money he acquired through the DFAS system. In response to the trial counsel's questions as to whether the appellant stated he spent the money for personal reasons, CPT Carr answered, "Yes, he did." When again

larceny offenses, as well as in determining an appropriate sentence for whatever offenses he was found guilty of committing. This use of the stipulation was specifically authorized by the pretrial agreement.

7. This question was relevant in that the appellant's answer could establish whether the taking was wrongful, whether there was any legitimate reason for the taking, or whether there was any affirmative defense to the taking. The answer could also establish whether the appellant had the requisite intent temporarily to deprive the government of the use or benefit of the property taken.

8. The appellant's defense counsel had three opportunities to object to CPT Carr's testimony: when notice was provided, when CPT Carr was called as a government witness, and when CPT

Carr was later recalled as a witness for the court. (At least one court member was confused as to where and when CPT Carr heard the appellant's statements.) No objection was made at any time to her testimony.

9. Captain Carr's recital of the appellant's other statements during the plea inquiry merely repeated what was already contained in—or attached as exhibits to—the stipulations of fact that were admitted into evidence pursuant to the pretrial agreement. These statements included the appellant's admissions that he acquired money through the DFAS system, and that withdrawals were made on the bank accounts in question. Although CPT Carr also testified that appellant stated that he did not notify anyone in his chain of command of his actions, the lack of authority for appellant's actions—that is, the wrongfulness of his actions—was not a contested issue at trial.

asked whether he spent it "for any legitimate purpose," CPT Carr answered, "No, it was for personal reasons." [10]

In addition to other evidence, the government introduced the appellant's pretrial statement to the military police, and, during the defense case, the appellant testified as well. In his pretrial statement, when asked whether he "used" any of the money in the bank account for his "own personal use," the appellant answered, "No, I have made withdrawals for my father-in-law, but I gave the money to him." In his testimony at trial, the appellant also admitted during direct examination that a more complete answer to this question would include the fact that he used some of the money for "personal reasons," such as gasoline for trips, and purchasing food at the commissary. As to the "test" of the finance system he was conducting, the appellant stated that he never stopped the test because he "lost control of the situation," and did not know how to explain it or fix it, and "got scared." The government, on the other hand, presented evidence that the appellant had the skill and requisite knowledge to stop the transactions anytime, and that specific procedures existed for "testing" the system—procedures which the appellant did not follow.

Just prior to the appellant's reassignment to the United States, the appellant closed the bank account in Germany and allowed his father-in-law to take all the funds remaining in the account with him to the Philippines, even though the appellant knew that the funds in that account were illegally obtained. The DFAS continued to transfer funds to the closed bank account after the appellant departed Germany, and, in accordance with the appellant's instructions, the bank thereafter forwarded four cashier checks to the appellant's address in Hawaii to reimburse the appellant for the funds the bank received from DFAS. The appellant did not deposit or cash these checks.

In his testimony, the appellant maintained that whatever money he obtained from these fictitious pay accounts was provided to his father-in-law and to the appellant's mother for "safekeeping." As part of his pretrial agreement with the convening authority, the appellant agreed to make full restitution to the government. The appellant fulfilled this condition just prior to trial by tendering to the government the four uncashed bank cashier checks in the amount of about $7,500.00. He testified at trial that he reimbursed the remaining amount he owed the government, over $20,000.00, from his parents' savings and from money he had provided to his father-in-law.

The judicial policy limiting the use of judicial admissions made during a guilty plea inquiry is a long-standing tenet of military justice. *See United States v. Caszatt*, 11 U.S.C.M.A. 705, 29 C.M.R. 521 (1960); *United States v. Dorrell*, 18 C.M.R. 424 (N.B.R. 1954). This policy was modified by the MCM, 1984, which required an accused to be questioned under oath about the offenses to which he was pleading guilty and to be advised that false answers may later be used against him in a prosecution for perjury or false statement. R.C.M. 910(c)(5) and (e). *See also* Military Rule of Evidence 410(a) [hereinafter Mil.R.Evid.]. Later, the Court of Military Appeals [11] held that statements made by an accused during a guilty plea inquiry could also be used as evidence of aggravating circumstances of the offenses of which the accused was convicted during sentence proceedings. *United States v. Irwin*, 42 M.J. 479 (1995); *United States v. Holt*, 27 M.J. 57 (C.M.A.1988).

However, the policy of limited use was not completely discarded by the MCM, 1984, or by cases decided since then. *See Holt*, 27 M.J. at 59. It is long-settled judicial policy that while a plea of guilty constitutes a judicial confession of guilt to a particular offense and is considered the strongest proof

---

10. Captain Carr's answer was nothing more than speculative opinion, to which no objection was entered. During the plea inquiry, the appellant did not state that he spent the money for personal reasons or that he had no legitimate reason for spending the money.

11. Renamed the U.S. Court of Appeals for the Armed Forces effective 5 October 1994. National Defense Authorization Act for Fiscal Year 1995, Pub.L. No. 103–337, § 924(a), 108 Stat. 2663, 2831 (1994).

of guilt under the law, such plea "admits *only* what has been charged and pleaded to." *Dorrell,* 18 C.M.R. at 425 (emphasis added). Although a plea of guilty may "be used to establish facts and elements *common* to both the greater and lesser offense[s] within the same specification," *Caszatt,* 29 C.M.R. at 523 (citing *Dorrell* )(emphasis added), it may not be used to prove a separate offense.

There is no authority for the proposition that the accused's answers during a guilty plea inquiry on one offense may be used as evidence by the government to prove a greater or separate offense to which the accused has pleaded not guilty. The government cites *United States v. Thomas,* 39 M.J. 1094 (A.C.M.R.1994), for the proposition that the appellant's admissions during a guilty plea inquiry can be used to establish *facts* relevant to both a lesser offense to which an accused pleads guilty and to a greater offense to which an accused pleads not guilty. We disagree. In *Thomas,* this court held that a military judge, as a finder of fact, could consider an accused's admissions during a guilty plea inquiry concerning consensual sodomy as *proof of one element* of the offense of forcible sodomy to which he pleaded not guilty. Although Thomas asserted on appeal that the military judge improperly considered the *content* of his admissions during the guilty plea inquiry *as evidence* to convict him of forcible sodomy, as well as to convict him on the other contested charges of rape and burglary, this court found no basis for that assertion.

■ Consistent with prior decisions of this and other courts, we hold that the elements of a lesser offense established by an accused's plea of guilty—but not the accused's admissions made in support of that plea—can

be used as proof to establish the common *elements* of a greater offense to which an accused has pleaded not guilty. *United States v. Thomas,* 39 M.J. 1094 (A.C.M.R. 1994); *United States v. Cahn,* 31 M.J. 729 (A.F.C.M.R.1990); *United States v. Collins,* 17 M.J. 901 (A.F.C.M.R.1983), *pet. denied,* 18 M.J. 292 (1984); *United States v. Caszatt,* 11 U.S.C.M.A. 705, 29 C.M.R. 521 (1960); *United States v. Wasco,* 8 C.M.R. 580 (N.B.R. 1953).

■ Thus, in this case, the government could properly rely upon the appellant's *plea* of guilty to wrongful appropriation to establish the common elements between this lesser offense and the greater offense of larceny—that is, that the appellant wrongfully took or retained government funds of a certain value on the dates and places as alleged in the specifications. Having established these common elements as a matter of law by the accused's plea of guilty, there would be no useful purpose served by allowing the government to introduce the appellant's statements during the guilty plea inquiry to support these same elements.[12] Furthermore, the government must independently prove that element—that is, an intent permanently to deprive—to which the accused has pleaded not guilty. Neither the appellant's guilty plea nor statements during the guilty plea inquiry are admissible to establish this separate element of the greater offense.[13]

We agree with the appellant that there is also a constitutional issue regarding the voluntariness of his statements during the plea inquiry—or at least the government's use of his statements against him to prove an offense to which he pleaded not guilty. It is clear from the facts of this case that the

---

12. In a trial with court members the military judge should instruct in such cases that "when a guilty plea has been accepted, the members should accept as proved the matters admitted by the plea, but must determine whether the remaining elements are established...." R.C.M. 920(e) discussion.

13. Presumably, in all such cases the government has, in its opinion, sufficient independent evidence of guilt to establish a separate element or elements. Otherwise it would not prefer or refer the greater offense, or would not make the decision to prove the greater offense after an accused

has pleaded guilty to a lesser offense. Contrast this situation with the permissible use of an accused's statements as evidence of aggravating circumstances during the sentencing portion of the court-martial or in a subsequent prosecution for perjury or false statement. Here, there may very well be no independent evidence available to the government on the aggravating circumstances, and in a subsequent prosecution for perjury or false statement, an accused's statements during the plea inquiry are essential to the government's case.

military judge obtained only a limited waiver against self-incrimination. The military judge, in advising the appellant, expressly limited the use of the appellant's statements during the plea inquiry when he advised the appellant that he gave up his privilege against self-incrimination "solely with respect to the issue of guilt or innocence, and only with respect to the offenses to which [he] pled guilty," and that his statements "may be used against him in the sentencing portion of trial." This advice was implicitly relied upon by the appellant in making his plea. Accordingly, the advice established the scope of the appellant's "knowing and intelligent" waiver of his privilege against self-incrimination. Any broader use would be violative of the appellant's right to remain silent.[14]

█ However, we find that any error involving the admission of CPT Carr's testimony about the appellant's statements to the military judge during the *Care* inquiry was waived by trial defense counsel's failure to object. R.C.M. 801(g) and Mil.R.Evid. 103(a)(1).

█ We also find that, in light of all evidence introduced at trial, any such error that may have occurred was harmless beyond a reasonable doubt. *Chapman v. California,*

386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). In this regard, we find that the evidence, independent of the appellant's guilty plea statements, clearly establishes that the appellant intended permanently to appropriate the money he took from the government for his own use and that of his family, and that he decided to repay the money only after his crime was detected by law enforcement authorities. Specifically, we note that the appellant's testimony as to how some of the money was taken and spent, how the remaining money was "safeguarded," and how he went about collecting the money to make restitution was far more damaging to him on the issue of intent that anything CPT Carr said during her testimony in court.

The findings of guilty and the sentence are affirmed.

Senior Judge EDWARDS and Judge GONZALES concur.

---

**14.** *See generally State v. Fuller,* 276 Mont. 155, 915 P.2d 809 (1996), distinguishing its opinion from a holding in *Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984).

Proscribing false statements is far different in a constitutional sense from compelling answers to "specifically incriminating questions."