[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 10, 2002
THOMAS K. KAHN
CLERK

_____

No. 00-13064

_____

D.C. Docket No. 00-00156-CV-J-20A

LOUIS NAPIER,

Plaintiff-Appellant,

versus

KAREN J. PRESLICKA,
Jacksonville Sheriff's Officer,
SANDRA M. POMEROY, Jacksonville
Sheriff's Officer, #6720,

Defendants-Appellees.

_____

Appeal from the United States District Court for the
Middle District of Florida

_____

**(December 10, 2002)**

Before BIRCH and BLACK, Circuit Judges, and PROPST[*], District Judge:

_____

[*] Honorable Robert B. Propst, United States District Judge for the Northern District of
Alabama, sitting by designation.

BIRCH, Circuit Judge:

In this case of first impression, we decide whether 42 U.S.C. § 1997e(e), a provision of the Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321 (1996) ("PLRA"), applies to claims that arise out of the arrest of an imprisoned plaintiff and claims unrelated to the current incarceration of that plaintiff. The district court held that § 1997e(e) applied under the facts of this case, and we AFFIRM.

## I. BACKGROUND

On 30 September 1997, deputies Karen J. Preslicka and Sandra M. Pomeroy approached Louis Napier and asked him for identification. Napier produced a valid Florida drivers' license, and the deputies departed, only soon to return to arrest Napier for trespassing. According to these deputies, Louis Napier was actually John Napier, who had received a trespass warning two years earlier, on 29 July 1995. John Napier is actually Louis's brother, but despite both Louis Napier and his companions making this distinction, the deputies persisted in the arrest and transported Napier to a pre-trial detention facility. The charge eventually was nolle prossed.

Later, while imprisoned on a separate offense, Louis Napier filed a 42 U.S.C. § 1983 action against the two deputies in which he alleged that he suffered

2

embarrassment and mental anguish from the deprivation of his Fourth Amendment rights occasioned by the September 1997 mistaken arrest and imprisonment. In this action, Napier proceeded pro se and in forma pauperis, as he does on this appeal. The district judge found that, because Napier had not alleged any physical harm arising from the actions of the deputies, he was not entitled to bring the action under the dictates of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(e). Without a valid legal basis for the claim, the district judge felt compelled to dismiss without prejudice the in forma pauperis complaint as frivolous, per 28 U.S.C. § 1915(e)(2)(B)(i).[1]

## II. DISCUSSION

A. Standard of Review

We review for abuse of discretion a district judge's decision that an in forma pauperis complaint is frivolous under 28 U.S.C. §1915(e)(2)(B)(i). Mitchell v. Brown & Williamson Tobacco Corp., 294 F.3d 1309, 1315 (11th Cir. 2002); Bilal

---

[1] The relevant part of that statute states:

[T]he court shall dismiss the case at any time if the court determines that –
      (A) the allegation of poverty is untrue; or
      (B) the action or appeal –
            (i)     is frivolous or malicious;
            (ii)    fails to state a claim on which relief may be granted; or
            (iii)   seeks monetary relief against a defendant who is immune from such relief.

28 U.S.C. § 1915(e)(2).

v. Driver, 251 F.3d 1346, 1349 (11th Cir. 2001). For purposes of § 1915(e)(2)(B)(i), an action is frivolous if it is "without arguable merit either in law or fact." Bilal, 251 F.3d at 1349. Because the district judge based its decision on legal frivolity, we must examine the validity of his assumption that § 1997e(e) prohibited this lawsuit in order to determine whether he abused his discretion under § 1915.

B. Applicability of 42 U.S.C. § 1997e(e)

Subsection (e) of 42 U.S.C. § 1997e states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." This statue is intended to reduce the number of frivolous cases filed by imprisoned plaintiffs, who have little to lose and excessive amounts of free time with which to pursue their complaints. See Harris v. Garner, 216 F.3d 970, 976-79 (11th Cir. 2000) (en banc) (surveying the legislative history of the PLRA). An action barred by § 1997e(e) is barred only during the imprisonment of the plaintiff; therefore, such action should be dismissed without prejudice by the district court, allowing the prisoner to bring his claim once released and, presumably, once the litigation cost-benefit balance is restored to normal. Id. at 980.

Tracking the language of the statute, § 1997e(e) applies only to lawsuits involving (1) Federal civil actions (2) brought by a prisoner (3) for mental or emotional injury (4) suffered while in custody. In <u>Harris</u>, we decided that the phrase "Federal civil action" means all federal claims, including constitutional claims. 216 F.3d at 984-85. This § 1983 action brought by Napier is a "Federal civil action" under this definition. We also had opportunity in <u>Harris</u> to clarify fully the meaning of the phrase "brought by a prisoner," holding that the PLRA applies to all cases <u>initiated</u> by a prisoner, without regard to whether that prisoner was released before the court considered the merits of his action. <u>Id</u>. at 974. It is undisputed that Napier filed his complaint while imprisoned. It is also undisputed that Napier's complaint alleges only emotional injuries, so as to satisfy the third predicate for the application of § 1997e(e).

The new legal issues in this case surround the fourth predicate, requiring that the emotional injury be "suffered while in custody." In particular, the question is whether this phrase is inclusive of injury suffered during the arrest of an individual on a charge unrelated to the present confinement.[2]

_____

[2] Napier's complaint could be read to allege injuries arising from his mistaken pretrial detention following his arrest for trespassing. However, Napier admits that § 1997e(e) would bar his lawsuit for injury arising from pretrial detention. He chooses instead to proceed on his claims for injuries arising distinctly from his arrest, and, accordingly, we see no reason to discuss the viability of any forfeited claims arising from the pretrial detention.

5

1. Injury suffered during arrest

We have not yet addressed whether the words "suffered while in custody," as used in § 1997e(e), cover more than just injury occurring while confined in a correctional institution.  In matters of statutory interpretation, we give overriding deference to the unambiguous language of the statute.  Harris, 216 F.3d at 972-73.

Looking at the statute as a whole, Congress was aware of its ability to restrict the application of the statute to persons confined in a correctional institution by using the term "prisoner" and defining that term in the statute itself.  Congress chose not to use the more restrictive "prisoner" language, instead opting to apply the statute to injuries occurring while in custody.  Congress is presumed to know the settled legal meaning of the terms it uses in enacted statutes and to use those terms in the settled sense.  Harris, 216 F.3d at 974.  The common usage of "custody," in the Miranda context in which the definition most often arises, reflects not just imprisonment, but, rather, any situation in which a reasonable individual would feel a restraint on his movement such that he would not feel free to leave.  Minnesota v. Murphy, 465 U.S. 420, 430, 104 S. Ct. 1136, 1144 (1984); Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966); United States v. McDowell, 250 F.3d 1354, 1362 (11th Cir. 2001).  Formal arrest is considered the archetype of a situation that results in Miranda custody.  Murphy, 465 U.S. at 430,

6

104 S. Ct. at 1144 (holding that custody for <u>Miranda</u> purposes means "formal arrest or restraint on freedom of movement . . . associated with formal arrest").

Given the structure of the statute, in particular, the lack of explicit connection between the term "custody" and the more restrictive phrases in the statute dealing with prisoner status and incarceration, and its plain language, we find that "custody" should be interpreted in light of its common definition. Accordingly, we find that the PLRA should apply to prisoner lawsuits that claim injuries suffered during custodial episodes, even if such custody occurred outside prison walls.

Turning to the particular circumstances of this case, Napier claims that he suffered injury from his mistaken arrest by the officers. The embarrassment or emotional harm occasioned by the mistaken arrest occurred, at the earliest, when Napier was arrested – or, using the <u>Miranda</u> construct, at the moment that a reasonable person in his situation would feel unable to leave. Because the harm complained of by Napier occurred while he was in custody, the PLRA applies to his claim, assuming the PLRA applies to causes of action unrelated to the plaintiff's present incarceration, as we must now discuss.

2. Injury occurring during a prior unrelated custodial episode

7

Based on our finding that Napier was "in custody" while the harm from the mistaken arrest accrued, it follows that were Napier imprisoned based on the trespass charge, he would be prohibited under the PLRA from bringing suit while thus imprisoned unless he alleged physical injury. In this case, however, Napier is not imprisoned on the trespass charge, but instead is imprisoned on an entirely unrelated offense. It could be argued that the PLRA's limitations should not apply to this case because the harm occurred during custody unrelated to Napier's current confinement.

Again, we are forced to examine the meaning of the phrase "in custody," which by its plain language does not provide a temporal restriction on the custodial episode to which it relates. One could argue that the phrase "in custody" is meant to refer to the present custody, that custody for which the prisoner is in fact currently a prisoner, or that the phrase "in custody" is meant to refer, without reference to the other parts of the statute, to past or present instances of custody. The first interpretation might reflect a narrow purpose of the PLRA to reduce frivolous prison condition litigation, those suits brought by prisoners to challenge what they view as unacceptable or, indeed, unconstitutional circumstances of their present confinement.

8

However, the first interpretation is not supported by the plain language of the statute, and it is that language to which we ultimately must turn. Congress could have drafted the statute to say "while thus imprisoned" or "while in that custody" or "during the aforementioned confinement" to specifically tie the clause in question to the antecedent in order to ensure that the first interpretation was followed. Even more simply, Congress could have used "while imprisoned" as it uses "prisoner" earlier in the statute if its intent was to limit the claims subject to the PLRA to those arising from harm accrued only in that limited venue.

Again, the problem with a narrow interpretation of "custody" is that Congress obviously knew how to limit the application of the statute to prisoners or to events occurring in prison, but did not do so, opting instead to use the common phrase "while in custody." "When the import of the words Congress has used is clear, as it is here, we need not resort to legislative history, and we certainly should not do so to undermine the plain meaning of the statutory language." Harris, 216 F.3d at 976. The impact of this language, which is unrestricted to present custody, is that the PLRA covers all federal civil lawsuits filed by prisoners concerning

emotional or mental injury suffered while in past <u>or</u> present custody, even if the subject of the filed lawsuits is unrelated to the current imprisonment.[3]

Practically, the problem of frivolous lawsuits filed by prisoners is not limited exclusively to those lawsuits dealing with conditions of confinement. The natural target of a prisoner's litigious aggression is the government, and, as in this case, the vectors for such aggression are not limited to lawsuits challenging prison conditions. Rather, prisoners have cause and opportunity to file frivolous complaints concerning the range of alleged slights imposed upon them by the government during their custodial episodes, both past and present, both in prison and in the back seat of a police cruiser.

### III. CONCLUSION

For the reasons stated above, the district court did not abuse its discretion by dismissing Napier's complaint. The PLRA forbids the litigation of this lawsuit

---

[3] We wish to stress that the effect of the PLRA is only to require that the prisoner wait until his term of imprisonment ends before bringing those federal actions subject to the PLRA. <u>See</u> <u>Harris</u>, 216 F.3d at 980. Congress presumed that post-incarceration filings of these types of suit would more properly reflect the opportunity costs of litigation and would filter out those of questionable merit.

The Eleventh Circuit has not yet been faced with a case that involves a prisoner's claim that is both barred by the PLRA during imprisonment and barred by the applicable statute of limitations after release from prison, thereby giving the plaintiff no opportunity to ever have his claim heard on the merits by a federal court. We proffer, but do not hold, as that issue is not before us, that such a result may be mitigated by the doctrine of equitable tolling, as other circuits have applied that doctrine to the administrative exhaustion requirement for prison condition suits under 42 U.S.C. § 1997e(a). <u>See</u>, <u>e.g.</u>, <u>Clifford v. Gibbs</u>, 298 F.3d 328, 332-33 (5th Cir. 2002).

10

while Napier is imprisoned, as he complains of injury occurring while he was in custody, and he did not allege physical injury arising from the actions of the defendant officers.[4] Therefore, we **AFFIRM**.

---

[4] Given our resolution of the case, we do not find it necessary to analyze the substantive viability of Napier's constitutional claim.

PROPST, District Judge, dissenting:

I respectfully dissent. I realize that the precise language of the pertinent statute may arguably call for the majority decision. And, as the majority states, the unambiguous language of a statute is entitled to "overriding deference." However, the majority discusses two possible interpretations of the phrase "in custody." It is axiomatic that these two possible interpretations make the term "in custody" ambiguous.[1] Given this ambiguity, I cannot understand why, as the majority suggests, the term in question should be construed "without reference to the other parts of the statute" or legislative history, where there is an obvious statutory scheme. As the Supreme Court has recently observed:

> In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning-- or ambiguity--of certain words or phrases may only become evident when placed in context. . . . It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." . . . A court must therefore interpret the statute "as a symmetrical and

---

[1]Because the term "in custody" is ambiguous, it is appropriate to look beyond the plain language of the statute. See United States v. DBB, Inc., 180 F.3d 1277, 1281 (11th Cir. 1999) ("We do not look at one word or term in isolation, but instead we look to the entire statutory context. . . . We will only look beyond the plain language of a statute at extrinsic materials to determine the congressional intent if: (1) the statute's language is ambiguous; (2) applying it according to its plain meaning would lead to an absurd result; or (3) there is clear evidence of contrary legislative intent.") (citations omitted).

12

coherent regulatory scheme," . . . and "fit, if possible, all parts into an harmonious whole."

FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33 (2000) (citations omitted). After looking at the statute as a whole, I believe that Congress intended "in custody" to mean, if not prison custody related to the present incarceration, at least prison custody.

Section 1997e is headed "Suits by prisoners." It begins with Section 1997e(a) which provides that "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." (Emphasis added). There follows Section 1997e(b) relating to an administrative "grievance" procedure which obviously concerns prison conditions rather than actions not related to prison conditions. Section 1997e(c) provides:

> (1) The court shall on its own motion or on the motion of a party dismiss any action brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility if the court is satisfied that the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief.

> (2) In the event that a claim is, on its face, frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief, the

13

court may dismiss the underlying claim <u>without first requiring the exhaustion of administrative remedies</u>.

(Emphasis added). Section 1997e(d)'s attorney fee provisions appear to be part of a continuum of provisions related to prison conditions. Next, of course, comes Section 1997e(e), the provision at issue. The provisions of Section 1997e(f)(1) likewise refer to prison conditions. Section 1997e(f)(2) provides:

> (2) Subject to the agreement of the official of the Federal, State, or local unit of government <u>with custody over the prisoner, hearings may be conducted at the facility in which the prisoner is confined.</u> To the extent practicable, the court shall allow counsel to participate by telephone, video conference, or other communications technology in any hearing held at the facility.

(Emphasis added).[2] It is unlikely that the statute contemplates such hearings "at the facility" as to defendants not connected to the prison who may have caused even a physical injury such as is referred to in Section 1997e(e).

It appears that Congress, when enacting the Prison Litigation Reform Act ("PLRA"), primarily sought to stem the tide of lawsuits brought by prisoners arising from the terms and conditions of their current imprisonment, which are likely to be the most frivolous, and not to prevent lawsuits by prisoners in general. The legislative history of the PLRA, attached, at least in part, hereto as an Appendix, supports that conclusion. It also seems to be the general consensus

---

[2]Note the reference to "with custody over the prisoner."

14

among other circuits. See, e.g., Kincade v. Sparkman, 117 F.3d 949, 951 (6th Cir. 1997) ("The two floor debates and hearing concerning the Prison Litigation Reform Act simply focused on more examples of frivolous prison condition suits . . . . The text of the Prison Litigation Reform Act itself reflects that the drafters' primary objective was to curb prison condition litigation."); United States v. Simmonds, 111 F.3d 737, 743 (10th Cir. 1997) ("The main purpose of the Prison Litigation Reform Act was to curtail abusive prison-condition litigation."); Santana v. United States, 98 F.3d 752, 755 (3d Cir. 1996) ("Congress enacted the PLRA primarily to curtail claims brought by prisoners under 42 U.S.C. § 1983 and the Federal Torts Claims Act, most of which concern prison conditions. . . .").

Moreover, if the majority is correct, then Section 1997e(e) could conceivably have a reach much broader than simply the present case. See Duvallon v. Florida, 691 F.2d 483, 485 (11th Cir. 1982) ("In the context of habeas proceedings, the 'in custody' requirement may also be met where a petitioner is on probation, parole, or bail.") (citing Hensley v. Municipal Court, 411 U.S. 345, 349 (1973)).

Harris v. Garner, 216 F.3d 970 (11th Cir. 2000) (en banc), is distinguishable. There, the decision hinged on the meaning of the word "brought," a derivative of

the word "bring."  The majority held that the words have a clear meaning.[3]  There

was no indication that the word "brought" had two possible interpretations.

Further, the case involved a "prison shakedown" claim.

Harris considers the relationship between the different provisions of Section

1997e.  The court stated:

> The language we have quoted from the Miller decision
> establishes that "brought" as used in section 1997e(a)'s "No action
> shall be brought..." language means filed.  And the same word means
> the same thing in section 1997e(e)'s "No federal civil action shall be
> brought ..." language.  See Atlantic Cleaners & Dyers v. United
> States, 286 U.S. 427, 433, 52 S. Ct. 607, 609, 76 L. Ed. 1204 (1932)
> ("[T]here is a natural presumption that identical words used in
> different parts of the same act are intended to have the same
> meaning."); Doctors Hosp., Inc. of Plantation v. Bowen, 811 F.2d
> 1448, 1452 (11th Cir. 1987)  ("A presumption is made that the same
> words used in different parts of an act have the same meaning.").

Id. at 974.  Harris also recognizes that there may be a greater need to examine

legislative history when statutory language is not "clear and unambiguous."  Id. at

977.

The majority says, "Congress was aware of its ability to restrict the

application of the statute to persons confined in a correctional institution by using

---

[3]The dissenters in Harris, agreeing with the majority, state, "It is obvious that the word 'brought' means 'commence[d] or started'..."  Id. at 990.  The only real dispute in Harris between the majority and the dissenters was whether the plaintiffs should have been allowed to supplement their complaint, filed with reference to prison conditions while they were prisoners, to reflect the fact that they had been released from prison.

the term 'prisoner' and defining that term in the statute itself. Congress obviously knew how to limit the application of the statute to prisoners or to events occurring in prison . . . ." I would hope that Congress would know how to make any statutory language clear. The point is that it did not do so, but used a term which the majority acknowledges is subject to two possible interpretations.[4] I cannot agree that a statute passed to limit frivolous litigation with regard to prison conditions applies to an action which accrued before the plaintiff was imprisoned and which is not even related to the charges that led to his imprisonment.[5] I am not suggesting that Congress could not have constitutionally applied the term "while in custody" as broadly as the majority holds. I am of the opinion, however, that there is no substantial support for a conclusion that it intended to do so.[6]

---

[4]The majority cites Harris for a proposition that begins, "When the import of the words Congress has used is clear, as it is here, . . . ."

[5]The plaintiff's complaint does not allege that his initial injury came "while [he was] in custody." He alleges that he was injured by being taken into custody. I recognize that the argument can be made that he did not actually "suffer" an injury until he was in custody, but the distinction requires still further stretching of Congressional intent. I cannot agree with the majority's observation that, "Based on our finding that Napier was 'in custody' while the harm from the mistaken arrest accrued, it follows that were Napier imprisoned based on the trespass charge, he would be prohibited under the PLRA from bring suit while thus imprisoned unless he alleged physical injury."

[6]I believe that if Congress had intended this one provision at Section 1997e (e) to depart from the overall scheme, it would have clearly said so.

In view of the ambiguity, the legislative history, the repeated references to prison conditions, the grievance provisions and administrative remedies which would have no application to the subject action, the unlikelihood of intending that actions such as this be heard at the prison facility, and the possible broad application to "custody" while on probation, etc., I would reverse the dismissal.

**APPENDIX**

The following are excerpts taken from the legislative history of the Prison

Litigation Reform Act:

> Over the past two decades, we have witnessed an alarming explosion in the number of lawsuits filed by State and Federal prisoners. According to enterprise institute scholar Walter Berns, the number of "due-process and cruel and unusual punishment" complaints filed by prisoners has grown astronomically- from 6,600 in 1975 to more than 39,000 in 1994. As Chief Justice William Rehnquist has pointed out, prisoners will now "litigate at the drop of a hat," simply because they have little to lose and everything to gain. <u>Prisoners have filed lawsuits claiming such grievances as insufficient storage locker space, being prohibited from attending a wedding anniversary party, and yes, being served creamy peanut butter instead of the chunky variety they had ordered</u>.

141 Cong. Rec. S7498-01, S7524 (daily ed. May 25, 1995) (statement of Sen. Dole) (emphasis added).

> Sections 4 and 5 of the bill will bar inmate lawsuits for mental or emotional injury suffered while in custody unless they can show physical injury. Of the 60,086 prisoner petitions in 1994 about two-thirds were prisoner civil rights petitions, according to the Administrative Office of the U.S. courts. Prisoner civil rights petitions are brought under 42 U.S.C. 1983. Section 1983 petitions are claims brought in Federal court by State inmates seeking redress for a violation of their civil rights. <u>"The volume of section 1983 litigation is substantial by any standard," according to the Justice Department's report on section 1983 litigation, "Challenging the Conditions of Prisons and Jails."</u>

141 Cong. Rec. S7498-01, S7527 (daily ed. May 25, 1995) (Statement of Senator Kyl) (emphasis added).

Chief Justice Rehnquist <u>was not referring to appeals by defendants protesting their innocence, but to the suits initiated by people claiming a deprivation of their rights while in prison.</u> Since almost any disciplinary or administrative action taken by prison officials now can give rise to a due process or cruel-and-unusual-punishment complaint, the number of these suits is growing at a rate that goes far to explain the "litigation explosion": from 6,606 in 1975 to 39,065 in 1994 (of which "only" 1,100 reached the Supreme Court).

Of the 1994 total, 37,925 were filed by state prisoners under a section of the so-called Ku Klux Klan Act of 1871, which permits actions for damages against state officials who deprive "any citizen of the United States or other person under the jurisdiction thereof, <of> any rights, privileges, or immunities secured by the Constitution and laws." This statute came into its own in 1961 when the Supreme Court permitted a damage action filed by members of a black family who (with good reason) claimed that Chicago police officers had deprived them of the Fourth Amendment right "to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." Today, the statute is used mostly by prisoners who, invoking one or another constitutional right, complain of just about anything and everything.

They invoke the cruel-and-unusual-punishment provision of the Eighth Amendment not only when beaten or raped by prison guards, but when shot during a prison riot, or when required to share a cell with a heavy smoker, or when given insufficient storage locker space, or when given creamy peanut butter instead of the chunky variety they ordered.

They involve the First Amendment when forbidden to enter into marriage, or to correspond with inmates in other state prisons. John Robert Demos sued one prison official for not addressing him by his Islamic name.

And there is probably not a prison regulation whose enforcement does not, or at least may not, give rise to a 14th

Amendment (or, in the case of federal prisoners, a Fifth amendment) due process complaint. Requiring elaborate trials or evidentiary proceedings, these especially, are the cases that try the patience of the judges. Still, reviewing these complaints imposes a particular burden on administrative officials who, unlike the judges, can be sued for damages.

141 Cong. Rec. S7498-01, S7527 (daily ed. May 25, 1995) (Article from the Wall Street Journal) (Attached to the Congressional Record) (emphasis added).

Almost 400 times last year, inmates in Arizona prison sued the state. Some of their claims:

An inmate wasn't allowed to go to his parents' wedding anniversary party; another said he was subject to cruel and unusual punishment because he wasn't allowed to attend his father's funeral.

An inmate claimed that he lost his Reebok tennis shoes because of gross negligence by the state. Another said the state lost his sunglasses. A woman inmate said the jeans she was issued didn't fit properly.

An inmate sued because he wasn't allowed to hang a tapestry in his cell.

When the state decided that inmates would not be allowed to see movies with exposed breasts and genitals, an inmate claimed that violated his Constitutional rights.

Inmates claimed the state stole money from their prison accounts. But another inmate claimed the state illegally deposited money in his account, disqualifying him as an indigent.

An inmate claimed he was wrongly disciplined for refusing to change the television from a Spanish-language channel.

An inmate said he was not provided the proper books for a black studies class he was taking.

Several inmates said they weren't allowed to go to the bathroom while using the law library.

One inmate was denied access to the law library after he kicked and tampered with a security device in the library.

An inmate said he wasn't allowed to get married.

An inmate said he was forced to work and not paid minimum wage.

Lawsuits filed by inmates are expensive for Arizona taxpayers. The Attorney General's Office budgets $1.5 million per year to fight the suits, not including court costs. Other state departments also pay some costs.

To cut down on the number of frivolous suits filed, the state Legislature last year passed a law that requires inmates to pay part or all of the filing costs from money earned in prison jobs. In addition, inmates who filed unsubstantiated or harassing lawsuits can be forced to forfeit five days of good-behavior credit.

The new law didn't slow down Mitchell H. Jackson, a convicted drug dealer incarcerated at the state prison in Tucson. Jackson has filed 22 suits against the state in recent years. He got off to a good start in 1995, filing two in the first week.
In one of his suits, he targets the new law requiring inmates to pay filing fees. He claims that has caused him "mental anguish and emotional distress." He wants $10 million from each of the 90 legislators-a total of almost $1 billion.


141 Cong. Rec. S7498-01, S7527-28 (daily ed. May 25, 1995) (Article from the Tucson Citizen) (Attached to the Congressional Record) (emphasis added).


Mr. President, I am pleased to join today with my distinguished colleagues, Senators HATCH, KYL, ABRAHAM, HUTCHISON, REID, THURMOND, SPECTER, SANTORUM, D'AMATO, GRAMM, and BOND, in introducing the Prison Litigation Reform Act of 1995.

This legislation is a new and improved version of S. 866, which I introduced earlier this year to address the alarming explosion in the number of frivolous lawsuits filed by State and Federal prisoners. It also builds on the stop- turning-out-prisoners legislation, championed by Senators KAY BAILEY HUTCHISON and SPENCER ABRAHAM, by making it much more difficult for Federal judges to

22

issue orders directing the release of convicted criminals from prison custody.

. . .

Unfortunately, the litigation explosion now plaguing our country does not stop at the prison gate. According to Enterprise Institute scholar Walter Berns, the number of "due-process and cruel and unusual punishment" complaints filed by prisoners has grown astronomically-from 6,600 in 1975 to more than 39,000 in 1994. These suits can involve such grievances as insufficient storage locker space, a defective haircut by a prison barber, the failure of prison officials to invite a prisoner to a pizza party for a departing prison employee, and yes, being served chunky peanut butter instead of the creamy variety. The list goes on and on.

141 Cong. Rec. S14408-01, S14413 (daily ed. Sept. 27, 1995) (Statement of Senator Dole) (emphasis added).

Our legislation also addresses the flood of frivolous lawsuits brought by inmates. In 1994, over 39,000 lawsuits were filed by inmates in Federal courts, a staggering 15 percent increase over the number filed the previous year. The vast majority of these suits are completely without merit. Indeed, roughly 94.7 percent are dismissed before the pretrial phase, and only a scant 3.1 percent have enough validity to reach trial. In my State of Utah, 297 inmate suits were filed in Federal courts during 1994, which accounted for 22 percent of all Federal civil cases filed in Utah last year. I should emphasize that these numbers do not include habeas corpus petitions or other cases challenging the inmate's conviction or sentence. The crushing burden of these frivolous suits makes it difficult for courts to consider meritorious claims.

In one frivolous case in Utah, an inmate sued demanding that he be issued Reebok or L.A. Gear brand shoes instead of the Converse brand being issued. In another case, an inmate deliberately flooded his cell, and then sued the officers who cleaned up the mess because they got his Pinochle cards wet.

23

It is time to stop this ridiculous waste of the taxpayers' money. The huge costs imposed on State governments to defend against these meritless suits is another kind of crime committed against law-abiding citizens

141 Cong. Rec. S14408-01, S14418 (daily ed. Sept. 27, 1995) (Statement of Senator Hatch).

The amendment also addresses prison litigation reform. Many people think of prison inmates as spending their free time in the weight room or the television lounge. But the most crowded place in today's prisons may be the law library. Federal prison lawsuits have risen from 2,000 in 1970 to 39,000 in 1994. In the words of the Third Circuit Court of Appeals, suing has because, recreational activity for long-term residents of our prisons.

Today's system seems to encourage prisoners to file with impunity. After all, it's free. And a courtroom is certainly a more hospitable place to spend an afternoon than a prison cell. Prisoners file free lawsuits in response to almost any perceived slight or inconvenience-being served chunky instead of creamy peanut butter, for instance, or being denied the use of a Gameboy video game-a case which prompted a lawsuit in my home State of Arizona.

141 Cong. Rec. S14408-01, S14418 (daily ed. Sept. 27, 1995) (Statement of Senator Kyl) (emphasis added).